**UNITED STATES, Appellee,**

v.

**Donald R. SARGENT, Sergeant, U.S. Army, Appellant.**

No. 46010.
CM 442231.

U.S. Court of Military Appeals.

Aug. 6, 1984.

For Appellant: *Colonel William G. Eckhardt, Captain Warren G. Foote, Captain William T. Wilson* (on brief).

For Appellee: *Colonel James Kucera, Lieutenant Colonel John T. Edwards,*

*Captain Thomas E. Booth, Captain Richard G. Mann, Jr.* (on brief).

## Opinion of the Court

EVERETT, Chief Judge:

Sergeant Donald R. Sargent was tried in Nurnberg, Germany, by a general court-martial composed of officer and enlisted members. Pursuant to his pleas, he was found guilty of crossing the Dutch-German international border without a military pass,[1] in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892. Contrary to his pleas, he was found guilty of involuntary manslaughter, and of possessing and selling heroin, in violation of Articles 119 and 134, UCMJ, 10 U.S.C. §§ 919 and 934, respectively. His sentence to a dishonorable discharge, confinement for 3 years, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade was approved by the convening authority. The United States Army Court of Military Review affirmed summarily, and we specified this issue for review:

> WHETHER A SALE OF A PROHIBITED SUBSTANCE CONSTITUTES AN OFFENSE "DIRECTLY AFFECTING THE PERSON" OF THE PURCHASER WITHIN THE MEANING OF ARTICLE 119(b)(2), UCMJ.

## I

Sargent was charged with involuntary manslaughter in this language:

> [T]hat ... [he], did at McKee Barracks, Crailsheim, Germany, APO 09751, a military installation located outside the territorial limits of the United States, on or about 25 October 1980, *while perpetrating an offense directly affecting the person* of Private First Class Philip E. Ramirez, to wit: wrongful sale of a habit forming narcotic drug, namely, heroin, unlawfully kill Private First Class Philip

E. Ramirez, by furnishing some amount of a habit forming narcotic drug, namely, heroin, to the said Private First Class Philip E. Ramirez, which caused his death after he inhaled it through his nose, commonly referred to as "snorting it".

(Emphasis added.)

At trial, the Government's evidence tended to show that Private First Class Doris Holley, Staff Sergeant David Dorsey, and Sargent went to Clyde McGuire's house, which was located about half a mile from McKee Barracks. Sargent's purpose was to obtain heroin. After McGuire and Sargent discussed the drug, McGuire went to a dresser and "pulled out" a "little plastic bag" which contained "some kind of tan powder." McGuire "dip[ped] into the bag with a butter knife" and said he was giving Sargent "two street grams." He then wrapped the substance in two pieces of white wrapping paper and gave it to Sargent. In turn, Sargent paid McGuire $130.

At approximately 5:30 p.m., Sargent and his two companions went to his barracks room. There, he "poured out the powder on ... [a] broken mirror" and used "a razor blade" to "cut it up into 50 or 60 little piles," which were put into separate bags. Sargent then placed the bags in "a little black pouch."

Between 6:30 and 7:00 p.m., Private First Class Philip Ramirez came to Sargent's room. Another individual, who had accompanied him there, waited in the hallway while Ramirez entered the room and talked briefly with Sargent. Sargent pulled out the black pouch, removed two bags of the powder, and sold them to Ramirez—who paid Sargent 100 deutsch marks and departed.

At 8:30 p.m., Holley left Sargent's room to go on guard duty at the gate, and "when ... [she] first ... got to work" a soldier

---

1. Specifically, he was charged with "crossing the international border into the Netherlands and returning across the international border into the Federal Republic of Germany without having in his possession a valid Department of the Army Form 31," in violation of paragraph 17,

USAREUR Regulation 632–10, dated April 1, 1977, and paragraph 37, Annex B, United States Army Europe Regulation 550–80, dated November 14, 1975, as amended by Change Number 7, dated August 2, 1979.

passed by and "said that someone had ODd." Approximately half an hour later, Sargent arrived at the gate, and when Holley asked him whether he also had heard the news, he "said he didn't want to talk about it at the time."

Actually, Ramirez had been found in a toilet stall in his barracks, and the medical authorities had pronounced him dead at 8:35 p.m. The autopsy revealed that he had died from an overdose of heroin, even though no needle marks or any other signs of injection were visible on his body. According to the Government's pathologist, his blood had been contaminated with 0.7 milligrams of morphine—a heroin metabolite—per liter of blood; and a level of 0.5 milligrams per liter is fatal. Alcohol also was found in Ramirez' blood, but the pathologist concluded that, although the combination of alcohol and heroin would have had a cumulative effect, the level of heroin in the blood was sufficient to have killed Ramirez, even in the absence of alcohol.

The Government's evidence also showed that approximately 28 milligrams of a white powdery substance containing 50% heroin hydrachloride had been found in Ramirez' fatigue pants pocket inside a white paper packet "that was kind of folded inside" a piece of a postal money order that was wrapped up. A single latent palm print was taken from the postal money order and white paper packet, but it did not match the prints of Ramirez or any other prints of which a record was available. Also discovered on Ramirez' body was this list of names containing dollar amounts next to them: "Rat, $25.00; Space Man, $20.00; Kelly, $10.00; and Winner, $30.00." Finally, an investigation of the death by law-enforcement officers revealed "that Ramirez was a user of drugs, predominantly hashish" and that "one individual said that he had saw [sic] Ramirez at approximately 1700 hours that day and Ramirez had confided in him that he had snorted skag."

**2.** In view of the allegations against appellant, we are concerned here only with (b)(2)—and

## II

Under Article 119(b), involuntary manslaughter is defined in these terms:

Any person subject to this chapter who, without an intent to kill or inflict great bodily harm, unlawfully kills a human being—

(1) by culpable negligence; [2] or

(2) while perpetrating or attempting to perpetrate an offense, other than those named in clause (4) of section 918 of this title (article 118), directly affecting the person; ....

For several reasons, appellant contends that Article 119(b)(2) does not encompass the facts of his case. First, he argues that by requiring the supporting offense to be one "directly affecting *the person*," (emphasis added), the Code intends that an accused be perpetrating or attempting to perpetrate an offense which necessarily involves an individual's physical body. The sale of heroin is not such an offense, appellant continues, because it does not necessarily involve the body of the purchaser. According to appellate defense counsel, Article 119(b)(2) does not allow "the person" to be "the victim of the crime in the broad sense such that any offense which involved him in any way would be deemed to 'affect' him."

Similarly, appellant contends that his mere act of selling the heroin was not an offense *"affecting"* (emphasis added) a person, because

[t]he elements of the sale of heroin in abstract do not inherently affect the person of any specific person, inasmuch as the purchaser may convey it to a third person without any contact with his own body and especially without using it in any way whereby the toxic effects of the drug might endanger him personally.

In this connection, appellant emphasizes that he did not assist Ramirez in using heroin. Moreover, he claims that none of

not with (b)(1).

the facts in his case indicates that he knew that Ramirez intended to use the heroin delivered to him by appellant.

Finally, appellant insists that the use of the word "directly" in Article 119(b)(2) means something more than proximate cause; otherwise it would be mere surplusage. According to appellant, when "a statute requires a 'direct' effect, it should be construed to require a result without the necessity of third party intervention, unless that intervention is inevitable." In his view, the sale of heroin to Ramirez was not an offense that "directly" affected Ramirez' person. Instead, the effect occurred because Ramirez or someone else performed an additional act—namely, ingestion or injection of the heroin.

As appellant acknowledges, consideration of these arguments requires reexamination of the decision in *United States v. Moglia*, 3 M.J. 216 (C.M.A. 1977), as well as of our more recent decision in *United States v. Mazur*, 13 M.J. 143 (C.M.A. 1982), to the extent that it cited *Moglia* approvingly.[3] As was appellant, Moglia was convicted of involuntary manslaughter under Article 119(b)(2), pursuant to a specification alleging

> that ... [he] did ... while perpetrating an offense directly affecting the person of [X], to wit: wrongful transfer of a habit forming narcotic drug, unlawfully kill ... [X] by furnishing some amount of a habit forming narcotic drug, heroin, to ... [X] which caused his death after injection into his body.

Like appellant, he contended that his act of transferring heroin to the deceased was not an offense "directly affecting the person" of the deceased. However, a majority of the Court rejected this argument, observing:

> In *People v. Taylor*, 11 Cal.App.3d 57, 89 Cal.Rptr. 697 (1970), the court held the furnishing of a restricted drug was an act inherently dangerous to human life. *Accord, United States. v. Uno*, 47 C.M.R. 683 (A.C.M.R. 1973); *People v.*

*Cline*, 270 Cal.App.2d 328, 75 Cal.Rptr. 459 (1969). Obviously, heroin is both a dangerous and a restricted drug in the military. *See generally United States v. Romero*, 1 M.J. 227 (1975). Furthermore, the transfer in the present case was directly related to a particular person (the deceased), not the public in general, and such transfer was made under circumstances indicating subsequent use by the deceased.

We then held that "the transfer of heroin was an inherently dangerous act which directly affected the person of the deceased." *Id.* at 217.

Like appellant, Moglia also had argued that the transfer of heroin did not proximately cause the death of X, who had injected the heroin into himself. However, we held that, because Moglia had admitted that the substance he had transferred to X "was the same heroin" that had caused X's death about four hours later,

> the transfer played a major role in the deceased's death, and it was, therefore, a proximate cause of such death; and the act of deceased of injecting the heroin did not absolve the appellant. [Citations omitted.] We, therefore, conclude the specification of Charge I alleged an offense [under Article 119(b)(2) of the Code].

*Id.* at 218 (footnote omitted).

Finally, Moglia contended that his plea of guilty to involuntary manslaughter should have been rejected on the basis of factual inconsistency. He reasoned that, because he was absent when the deceased had injected himself, he could not have been personally aware—contrary to his "admissions" during the providence hearing—that the heroin he had transferred to X was indeed the same heroin that X used with fatal results. However, the Court concluded that the record contained an adequate factual basis for the pleas, in view of the parties' stipulation that a named individual was present when Moglia transferred the heroin to X and that the same individual

---

**3.** *Mazur* involved Article 119(b)(1), Uniform Code of Military Justice, 10 U.S.C. § 919(b)(1),

rather than Article 119(b)(2), but the Court reiterated its earlier holding in *Moglia*.

was in X's company up until the time X injected it.

Judge Fletcher dissented in *Moglia* because he did not

agree with the majority's interpretation of Article 119(b)(2), UCMJ, 10 U.S.C. § 919 (b)(2), particularly their perception of the meaning of the term "while." I believe that the term "while" properly "is a word of time and not of causation." [Citations omitted.]

3 M.J. at 219. Appellant here undoubtedly agrees with Judge Fletcher's view of the proper meaning of "while." *See State v. Mauldin*, 215 Kan. 926, 529 P.2d 124 (1974) (the felonious sale of heroin was complete when seller and purchaser parted company, so purchaser's subsequent injection of it did not occur while the felony was being perpetrated). However, he also urges that the *Moglia* majority completely misinterpreted the phrase "directly affecting the person." Furthermore, in his view, *Moglia* —even if correctly decided—is distinguishable on its facts.

### III

Initially, we observe that, although both Moglia and appellant furnished heroin to someone who later died of an overdose, the evidence is much less compelling here than it was in *Moglia* that the accused was the source of the particular drug which caused the death in question. Indeed, the Government's own proof indicated that Ramirez might have died of heroin obtained elsewhere. Rather than grapple with legal sufficiency of the evidence in this record, we turn to an examination of the intended scope of Article 119(b)(2)'s language: "while perpetrating or attempting to perpetrate an offense ... directly affecting the person."

The predecessors of Article 119 prohibiting manslaughter were Article of War 93 and Section 119 of Naval Courts and Boards. Hearings on H.R. 2498 Before a Subcomm. of the House Armed Services Committee, 81st Cong., 1st Sess. 1232 (1949), *reprinted in Index and Legislative*

*History, Uniform Code of Military Justice.* Article of War 93 did not define manslaughter, but simply stated that "[a]ny person subject to military law who commits manslaughter [or certain other specified crimes] shall be punished as a court-martial may direct."

The Manual for Courts-Martial, U.S. Army, 1917, however, did address the nature of manslaughter. It divided the crime into: (a) voluntary manslaughter, "where the act causing the death is committed in the heat of sudden passion caused by provocation"; and (b) involuntary manslaughter, which it defined as "homicide unintentionally caused in the commission of an unlawful act not amounting to a felony, nor likely to endanger life, or by culpable negligence in performing a lawful act or in performing an act required by law." This Manual further explained:

In involuntary manslaughter in the commission of an unlawful act the act must be *malum in se* and not *merely malum prohibitum*. Thus the driving of an automobile in slight excess of the speed limit fixed by ordinance is not the kind of unlawful act contemplated, but voluntarily engaging in an affray is such an act. To use an immoderate amount of force in suppressing a mutiny is an unlawful act, and if death is caused thereby the one using such force is guilty of manslaughter at least.

Para. 443, p. 253.

The Manual for Courts-Martial, U.S. Army, 1921, initiated its discussion of manslaughter with the comment that "[m]anslaughter at common law is unlawful homicide without malice aforethought and is either voluntary or involuntary." Then it quoted the statutory definition of manslaughter in the Federal Penal Code,[4] whereunder involuntary manslaughter is an "unlawful killing ... [i]n the commission of an unlawful act not amounting to a felony, or the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circum-

---

4. Federal Penal Code, 1910, section 274.

spection." The Manual noted: "This statutory definition governs courts-martial. It is, however, declaratory of the common law, to which, therefore, reference may be had for the principles underlying the statutory definitions." The ensuing discussion of manslaughter is identical with the 1917 version. Para. 443, pp. 414–15.

The Manual for Courts-Martial, U.S. Army, 1928, does not refer specifically to the Federal statutes for a definition of manslaughter. *See* para. 149*a*, pp. 165–66. Its definition of "[i]nvoluntary manslaughter is "homicide unintentionally caused in the commission of an unlawful act, not amounting to a felony, nor likely to endanger life, or by culpable negligence in performing a lawful act, or in performing an act required by law." In place of the sentence in the 1917 and 1921 Manuals which referred to "malum in se" and "malum prohibitum," it substituted this equivalent:

> In involuntary manslaughter in the commission of an unlawful act, the unlawful act must be evil in itself by reason of its inherent nature and not an act which is wrong only because it is forbidden by a statute or orders.

Otherwise, the discussion of involuntary manslaughter follows that in the earlier Manual.

The Manual for Courts-Martial, U.S. Army, 1949, deletes from its definition of involuntary manslaughter the words "not amounting to a felony." Otherwise, its treatment of the offense is substantially like that of the 1928 Manual. Para. 180*a*, p. 234.

Article 22(a), Articles for the Government of the Navy, provided that "[a]11 offenses committed by persons belonging to the Navy which are not specified in the foregoing articles shall be punished as a court-martial may direct." Section 119 of Naval Courts and Boards (1937) noted that manslaughter was "provided for under" Article 22 "and by 18 U.S. Code, 453 and 454." Thereafter, it quoted Section 453 of the U.S. Code, which is virtually identical to the Federal Penal Code provision quoted in the 1921 Army Manual for Courts-Martial.

Also, section 119 follows the 1917 and 1921 Manuals in stating: "In involuntary manslaughter in the commission of an unlawful act the act must be *malum in se* and not *merely malum prohibitum.*"

■ The foregoing history of involuntary manslaughter as a crime punishable by courts-martial prior to the Code reveals uniformity between the Army and the Navy. Each service relied on the definition of the crime in the Federal Penal Code—a definition which was derived from the common law and is still used in Federal prosecutions. *See* 18 U.S.C. § 1112.

Why, then, did Congress decide to redefine involuntary manslaughter? The answer is not clear from the legislative history. Major General Thomas H. Green, the Judge Advocate General of the Army, pointed out "that the requirement in the article as presently written that the act be one 'directly affecting the person' is misleading and perhaps too restrictive." (*See* Hearings on H.R. 4080 Before a Subcomm. of the Senate Armed Services Committee, 81st Cong., 1st Sess. 276 (1949), *reprinted in Index and Legislative History, supra,* and at 96 Cong. Rec. 1307 (1950). With this criticism in mind, Senator Tobey proposed unsuccessfully that the language be amended to read in this manner:

> (b) Any person subject to this code who unintentionally kills a human being in the commission of a culpably negligent act or in the commission of an act wrongful in itself but not inherently dangerous to life is guilty of involuntary manslaughter and shall be punished as a court-martial may direct.

96 Cong. Rec. at 1307. This language was substantially similar to that which had been used in the various Manuals for Courts-Martial.

The discussion of paragraph 198, in the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, provides this background for the change in definition:

> *Manslaughter.*—Article of War 93 listed the term "manslaughter" among vari-

ous crimes and thereby adopted the common law concept of voluntary and involuntary manslaughter. Article 119 of the Uniform Code adheres to the distinction and defines the two types of manslaughter. There is no substantial difference between the old and the new law concerning voluntary manslaughter.

As far as the offense of involuntary manslaughter is concerned, the terminology used in Article 119 to define the offense differs considerably from the common law terminology, but in substance the difference in definition is not very great. Under the common law, as under Article 119(b)(1), the first of the two types of involuntary manslaughter arises from culpable negligence. The second type of involuntary manslaughter at common law arises from the commission of a criminal act malum in se but not amounting to a felony of a kind which would naturally tend to cause death or great bodily harm to another person. The criminal act must not be a felony of this kind as otherwise the resulting homicide would constitute a felony murder. To illustrate, if a homicide results from a simple assault and battery, as from striking the victim with a fist—or with a weapon not of a deadly type—in such a way as would not be likely to cause death or great bodily harm, and the assailant has no intent to kill or inflict great bodily harm, the offense is involuntary manslaughter at common law. Such a situation would constitute involuntary manslaughter also under Article 119(b)(2) despite the difference in terminology. *The phrase . . . "directly affecting the person" is the result of an endeavor to define the distinction between malum in se and malum prohibitum.* The phrase "affecting the person" may be found in Section 1050 of the New York Penal Law which contains a comparable provision with respect to involuntary manslaughter.

(Emphasis added.)

Section 1050 of the New York Penal Law, referred to in the foregoing passage, punishes as manslaughter in the first degree a "homicide . . . [b]y a person engaged in committing, or attempting to commit, a misdemeanor, affecting the person or property, either of the person killed, or of another." More than fifteen years before the Uniform Code was enacted, this section was interpreted by the New York Court of Appeals in *People v. Grieco*, 266 N.Y. 48, 193 N.E. 634 (1934). There, in overturning the defendant's conviction for manslaughter, the Court noted:

Defendant has been convicted of the crime of manslaughter in the first degree for causing the death of Grace Burgess while in an intoxicated condition and engaged in driving an automobile in a reckless manner. In so far as is material here, the indictment charged the defendant with the crime of manslaughter in the first degree in two counts:

1. While "engaged in committing a misdemeanor affecting the person of one Grace Burgess," the deceased, while violating subdivision 5, § 70, of the Vehicle and Traffic Law of the state (Consol. Laws, c. 71).

2. While "in the act of committing a misdemeanor, to wit, reckless driving in violation of section 58 of the Vehicle and Traffic Law of the state.

Although acknowledging that, at the time of the victim's death, defendant had been committing a misdemeanor by driving recklessly while intoxicated, the Court of Appeals commented:

How can it be said, however, that the unlawful act in which he was engaging was "a misdemeanor, affecting the person or property, either of the person killed, or of another"? Defendant did not intentionally hit the deceased. He did not see her until the very instant of contact. The degree of the crime cannot be fixed "by analyzing the constituent acts which, in combination, make up the transaction, and viewing them distributively. It is determined by the quality and purpose of the transaction as a whole." Messersmith v. American Fidelity Co., 232 N. Y. 161, 166, 133 N.E. 432, 433, 19 A.L.R. 876.

> *A moment before the collision the defendant's conduct constituted a crime, a misdemeanor against society, against law and order, and against the people of the state. The commission of the misdemeanor in which he was engaged was not one affecting the person or property of deceased or of another. He had not seen the deceased and did not know that she was present.* The fact that his automobile struck her could not instantly change his conduct so as to make it an act affecting the person of the deceased and thereby make him liable for the crime of manslaughter in the first degree ....
>
> \* \* \* \* \* \*
>
> A conviction may be had for manslaughter in the first degree if, at the time, the driver is engaged in committing or attempting to commit a misdemeanor *affecting some particular person or property as distinguished from a misdemeanor affecting society in general.*

*Id.* 193 N.E. at 635–36 (emphasis added).

Consistent with the interpretation in *Grieco* of the phrase, "affecting the person," paragraph 198*b* of the Manual for Courts-Martial, United States, 1951, explained:

> By an offense directly affecting the person is meant one affecting some particular person as distinguished from an offense affecting society in general. Among offenses directly affecting the person are the various types of assault, battery, false imprisonment, voluntary engagement in an affray, the use of more force than is reasonably necessary in the suppression of a mutiny and riot, and maiming.

Although the illustrations in the Manual do not purport to be exclusive, they all involve situations in which physical force is applied immediately against an individual's body. Thus, they suggest that the statutory phrase "affecting the person" uses the word "person" not only to refer to an individual—as distinguished from society in general—but also to mean the physical "person" of the individual. The presence of the word "directly" in Article 119(b)(2) supports such an interpretation and indicates that Congress intended involuntary manslaughter to be a crime narrower in scope than it had been in military law before enactment of the Code. In light of that intent, the sole act of selling heroin to someone who then overdoses and dies would seem inadequate alone to sustain a conviction under Article 119(b)(2).

Civilian precedent tends to support the view that language like that of Article 119(b)(2) will not authorize a manslaughter conviction of someone who only sells a drug to the deceased. *See, e.g., State v. Forsman,* 260 N.W. 2d 160 (Minn. 1977) (seller of heroin who then aids purchaser in preparing and injecting it is guilty under a felony-murder statute, because the distribution of the heroin under these facts was—in the words of the statute—"a felony upon or affecting the person whose death was caused," *id.* at 164, though "distribution by other means ... would present a different issue," *id.* at 164 n.7). *Cf., e.g., State v. Dixon,* 109 Ariz. 441, 511 P.2d 623 (1973) (sole act of selling heroin to a purchaser, who voluntarily and out of the presence of the seller injects the quantity purchased and dies, is not second-degree murder under a statute providing that "[a]ll other kinds of *murder* [than those specified] are of the second degree," *id.* at 624; statute does not provide that all *homicides* committed during unnamed felonies are second-degree murder); *Sheriff, Clark County v. Morris,* 659 P.2d 852 (Nev. 1983) (under statute similar to that involved in *Dixon,* seller of a controlled substance was guilty of second-degree murder where he then actually participated in administering a lethal overdose, although sale alone or sale and ingestion of a nonlethal dose in the seller's presence would not constitute second-degree murder).

■ Thus, so far as we can determine, there is no civilian precedent for the proposition that the mere sale of a drug is an offense "directly affecting the person" of

the purchaser.[5] In view of this dearth of precedent to support such an interpretation of the statutory language in Article 119(b)(2), the precedents pointing in the opposite direction, and the legislative history of that article, we conclude that a conviction for involuntary manslaughter cannot be sustained solely by evidence that an accused sold someone a drug and that the purchaser later died from an overdose of that drug. On the other hand, when the seller has gone further and assisted the purchaser in injecting or ingesting the drug, the sale becomes one which does directly affect the person for purposes of Article 119(b)(2). Furthermore, because assisting someone to inject or ingest a drug constitutes aiding and abetting use of the drug and because such use is "an offense directly affecting the person," this prerequisite for Article 119(b)(2)'s application is present under those circumstances.[6]

▉ Of course, where death results from sale or transfer of a drug, occurrence of the death is an aggravating circumstance in a prosecution for the sale or transfer. Thus, even if manslaughter has not been charged, and even if the accused has pleaded not guilty, evidence about the relation of the drug offense to the death can be offered by way of aggravation during the presentencing proceedings. *United States v. Vickers*, 13 M.J. 403 (C.M.A. 1982).

The possibility of prosecution for a homicide if a customer dies from an overdose may help deter drug dealers. If it is convinced of this, Congress may choose to rewrite Article 119(b)(2)—as was suggested by General Green and by Senator Tobey during the legislative hearings and debate on the Code. However, under the present restrictive Codal language, this Court must hold that the sale of a drug by itself does not sustain a conviction of involuntary manslaughter under Article 119(b)(2).[7]

IV

The decision of the United States Army Court of Military Review is reversed as to Additional Charge II and its specification and the sentence. The findings of guilty thereon are set aside and Additional Charge II and its specification are dismissed. The record of trial is returned to the Judge Advocate General of the Army for submission to that court for reassessment of the sentence based on the affirmed findings of guilty.

FLETCHER, Judge (concurring):

I concur in this opinion with the exception of footnote 6.

COOK, Senior Judge (concurring):

The evidence of record fails to establish that the heroin ingested by the victim was that sold to him by the accused; that the accused knew at the time of sale that the victim intended to use it himself; or that the accused played any other part in assisting the victim in ingesting the heroin. In view of such shortcomings in proof, there is insufficient evidence to sustain a conviction of involuntary manslaughter of the accused. *Cf. United States v. Moglia*, 3 M.J. 216 (C.M.A. 1977); *United States v. Mazur*, 13 M.J. 143 (C.M.A. 1982).

---

5. In *State v. Warwick*, 16 Wash.App. 205, 555 P.2d 1386 (1976), and *State v. Thomas*, 118 N.J.Super. 377, 288 A.2d 32 (1972), sellers of controlled substances were convicted of manslaughter when their customers subsequently died from use of the substances. In neither case, however, is the language of the statute under which the defendant was convicted apparent; and the court in *Warwick* expressly declined to resolve a claim that "proximate cause" is not an appropriate concept to be applied in criminal cases, because the defendant had not properly preserved the issue for appeal. 555 P.2d at 1390–91.

6. Even when a seller cannot be prosecuted for manslaughter under Article 119(b)(2), he may still be subject to prosecution under Article 119(b)(1). Furnishing a restricted drug has been held to be "an act inherently dangerous to human life," *see United States v. Moglia*, 3 M.J. 216, 217 (C.M.A. 1977). Creation of this danger provides some evidence of culpable negligence, which is required for conviction under Article 119(b)(1).

7. "The objective of deterring the sale and use of heroin is, of course, very desirable, but an objective in itself does not justify a rule that is otherwise unsound." *State v. Mauldin*, 215 Kan. 956, 529 P.2d 124, 126 (1974).