**UNITED STATES, Appellee,**

v.

**Specialist Four Gerald W. WITT, 552–53–9225, United States Army, Appellant.**

**CM 447616.**

U.S. Army Court of Military Review.

5 Dec. 1985.

For Appellant: Lieutenant Colonel Paul J. Luedtke, JAGC, Major John E. King, JAGC, Captain Richard J. Anderson, JAGC (on brief).

For Appellee: Colonel James Kucera, JAGC, Lieutenant Colonel Adrian J. Gravelle, JAGC, Major Byron J. Braun, JAGC, Captain Jan M. Wamsted, JAGC (on brief).

Before RABY, CARMICHAEL, and ROBBLEE Appellate Military Judges.

---

OPINION OF THE COURT

RABY, Senior Judge:

Pursuant to his negotiated plea of guilty, appellant was convicted of wrongful distribution of Lysergic Acid Diethylamide (LSD). He received a sentence of a dishonorable discharge, confinement for four years, forfeitures of all pay and allowances, and reduction to the grade of Private E–1. The convening authority approved only so much of the sentence as provided for dishonorable discharge, confinement for twenty-one months, forfeiture of all pay and allowances, and reduction to the grade of Private E–1.

Appellant asserts that the military judge erred by improperly considering evidence in aggravation which was not directly related to his offense—specifically, evidence that a soldier named Rodrigues, shortly after ingesting LSD purchased from appellant, assaulted several other soldiers with a knife.

I. The Facts Offered In Aggravation

The following pertinent facts were admitted in evidence after defense counsel's motion in limine was denied. Appellant distributed one-half of a square of blotter paper containing LSD to Private Henry Rodrigues who consumed the drug in appellant's presence. Shortly after Private Rodrigues consumed the LSD, he returned to his own barracks room with Private Bunde and Specialist Hutchinson. When the men arrived at their room, they listened to music and drank some beer. Private Rodrigues opened his wall-locker, removed a knife and without any provocation, attacked Private Bunde, cutting him under the left eye and on the bridge of the nose, and stabbing him in the neck with the knife. Specialist John Valenzuela, another occupant of the room who was in bed attempting to sleep, got up and attempted to subdue Private Rodrigues. Private Rodrigues then attacked Valenzuela and cut him on the back of his head, on his back, and on his chest. Specialist Michael Seeberger, another occupant of the room, was awakened and attempted to help Specialist Valenzuela disarm Private Rodrigues. Private Rodrigues attempted to stab Specialist Seeberger in the back, but the knife blade folded from the impact of the blow cutting Private Rodrigues' hand. Specialist Valenzuela then fled from the room. Specialist Seeberger was prevented from leaving the room by Private Rodrigues who was brandishing the knife and blocking the exit. At this time, Specialist Earvin Cyprian (who lived down the hall) was disturbed by loud noises. He entered the room and observed Private Rodrigues attacking Specialist Seeberger with the knife. Specialist Cyprian grabbed a mop handle and swung it at Private Rodrigues in order to divert the attack on Specialist Seeberger. Private Rodrigues attacked Specialist Cyprian with the knife, and Specialist Cyprian fled from the room into the hallway. Private Rodrigues went into the hallway holding the knife in his left hand and the mop handle in his right. Private Rodrigues again attacked Specialist Cyprian who defended himself with another wooden handle. Private Rodrigues returned to his room and locked the door. Shortly thereafter, Sergeant Jose A. Pena, the Charge of Quarters (CQ), arrived at the room and ordered Private Rodrigues to open the door. Private Rodrigues refused to comply and Sergeant Pena could hear the sound of breaking glass against the inside of the door of the room. The CQ then forcibly opened the door, went inside, and disarmed Private Rodrigues. The CQ asked Private Rodrigues, "What's going on?" Private Rodrigues replied that the pressure was simply too much and he could not take it any longer. Private Rodrigues then told the CQ that he was upset with the other occupants of his room because he had buffed and waxed the floor and they had not maintained it in a clean manner.

All of the other individuals involved with Private Rodrigues were on good terms with him before this incident. All individuals said that Private Rodrigues' behavior was abnormal, that he appeared not to be himself, that his eyes appeared glassy and that he did not speak or say anything during the attack.

Private Rodrigues testified that, prior to this incident, he had never assaulted anyone with a knife or engaged in any episodes where he directed violence toward another person. He conceded that his violent conduct that evening was out of character for him. Although he believed his actions were "mainly" the result of a lot of pressure, Private Rodrigues admitted that his ingestion of LSD and alcohol "just combined with everything" to contribute to his conduct. On a prior occasion when he had ingested LSD, he had "felt pretty good" and had not assaulted anyone. During the evening in which he assaulted several soldiers, Private Rodrigues was not sure he had experienced any effects from the LSD.

It was stipulated that Dr. Herbert Tauger, a psychologist, the Civilian Program Coordinator and Alcohol and Drug Control Officer for the Mainz Community, would testify that:

Common effects of LSD use include mental sensations such as "crossover" where sounds are seen and visions are heard. Additionally, loss of appetite and sleep disturbance are common among users of LSD, as are changes in depth perception where great heights may appear small. Illusions, hallucinations, an altered sense of time, the loss of normal thought process, and panic or fear of harm (which may result in violent behavior by or on the part of the one consuming the substance) are also common reactions. Flashbacks may occur with use of LSD, but normally occur only from heavy use. Scientific studies indicate other reactions range from anxiety and depression to borderline and acute psychoses.

The typical LSD "trip" is influenced by the individual's personality, his mind set and the physical setting in which he takes the drug. The powerful nature of LSD can be destructive to an emotionally unstable person and even to a healthy person in an unsupervised setting. Recent studies indicate that brain or chromosonal [sic] damage may also result from long term LSD ingestion.

I am familiar with the facts of the consumption of an unknown quantity of LSD by PV1 Rodrigues and his subsequent actions in attacking several individuals with a knife. I am also familiar with the other facts set forth in the Stipulation of Fact concerning the incident. It is my opinion that PV1 Rodrigues' behavior could have been caused by the effects of LSD consumption.

The military judge considered the testimony of Private Rodrigues, the stipulation of expected testimony of Dr. Tauger, and the stipulation of fact concerning the assaultive conduct of Private Rodrigues in determining an appropriate sentence.

## II. Matters In Aggravation

In the presentencing proceedings of a court-martial in which an appellant has been convicted of the distribution of drugs, it is permissible to receive evidence in aggravation, under Rule for Courts-Martial (RCM) 1001(b)(4), of "the psychological and physiological effects of the drug illegally [distributed] by appellant to aid the court members in assessing a punishment to fit the crime." *United States v. Corl*, 6 M.J. 914, 916 (NCMR), *pet. denied*, 8 M.J. 41 (CMA 1979). This rule is equally applicable when trial is by military judge alone.

The bulk of the aggravating evidence admitted by the military judge, however, was not limited to the psychological and physiological effects of LSD on persons in general, but concerned the violent conduct of the soldier who ingested the LSD distributed by appellant and the effect his violent conduct had on other soldiers who were assaulted by him.

In determining whether error occurred in this case, we must first examine RCM 1001(b)(4), which pertinently provides:

The trial counsel *may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty.*

(Emphasis supplied). This subsection of RCM 1001 "is consistent with the interpre-

tation of" paragraph 75b(3),[1] in *United States v. Vickers*, 13 M.J. 403 (CMA 1982). *See* Manual for Courts-Martial, United States, 1984 (MCM, 1984), App. 21, part II, RCM 1001. In *Vickers*, the Court of Military Appeals held that, regardless of the plea, the prosecution could present in aggravation evidence "directly related to the offense for which an accused is to be sentenced so that the circumstances surrounding that offense or its repercussions may be understood by the sentencing authority." *United States v. Vickers*, 13 M.J. at 406.

In interpreting what type of evidence is "directly related to" a given offense, this court will liberally construe RCM 1001(b)(4) to comply with the President's intent in promulgating the presentencing rules in the MCM, 1984. As we have previously stated:

> It is clear that in promulgating the Manual for Courts-Martial, United States, 1984 ... the President intended to greatly expand the types of information that could be presented to a court-martial during the adversarial presentencing proceeding. In fact, the drafters of the MCM have expressly indicated that RCM 1001 is intended to permit "the presentation of *much of the same information* to the court-martial *as would be contained in a presentence report* but it does so within the protections of an adversarial proceeding, to which rules of evidence apply, although they may be relaxed for some purposes."

*United States v. Harrod*, 20 M.J. 777, 779–80 (ACMR 1985); *see United States v. Per-*

*ry*, 20 M.J. 1026 (ACMR 1985). It is in this light that the provisions contained in RCM 1001 must now be interpreted, even those which mirror previous MCM, 1969 terms. Thus, once evidence that is "directly related to" any of the offenses of which an accused has been convicted is offered in aggravation, it is admissible under RCM 1001(b)(4), provided that the evidence is relevant. *See generally United States v. Arceneaux*, 21 M.J. 571 (ACMR 1985); *United States v. Harrod*, 20 M.J. at 779. This evidence may be direct or circumstantial in nature. *United States v. Harrod*, 20 M.J. 777; *United States v. Pooler*, 18 M.J. 832, 833 (ACMR 1984), *pet. denied*, 19 M.J. 317 (CMA 1985). However, if defense counsel at trial makes a timely and specific objection to the admission of that evidence based on Military Rule of Evidence (MRE) 403, the military judge must apply the MRE 403 balancing test before the evidence can be admitted in aggravation. *United States v. Green*, 21 M.J. 633 (ACMR 1985).[2]

In the case at bar, appellant asserts that "[t]he weight of the evidence does not support the military judge's findings ... that Rodrigues' ingestion of the LSD caused Rodrigues' assaultive behavior" even assuming that a "causal connection" existed between appellant's drug distribution and the injuries subsequently sustained by innocent victims.[3] Although appellant has been somewhat vague in his interpretation of RCM 1001(b)(4), examination of the trial record reflects that at trial and on appeal appellant has attempted to apply certain principles of tort law in interpreting this RCM. This court is unaware of any civil-

---

**1.** Manual for Courts-Martial, United States, 1969 (Revised edition) (MCM, 1969), para. 75*b* (3). Paragraph 75*b* (3), MCM, 1969, was amended to be para. 75*b* (4) (amended by Executive Order 12315, dated 29 July 1981).

**2.** In *United States v. Green*, 21 M.J. 633, this court modified the holdings in *Harrod, Arceneaux,* and *Perry* to the limited extent that those cases required the military judge to apply *sua sponte* the MRE 403 balancing test before admitting evidence in aggravation. The burden is, instead, on the defense counsel to make a timely and specific objection, thus triggering the appli-

cation of the MRE 403 balancing test by the military judge.

**3.** Appellant also states that he is "not liable for an endless series of repercussions from the distribution of LSD." As to this point, we certainly agree. Obviously, RCM 1001(b)(4) must have some outer limit or the RCM is meaningless. More importantly, it would be wanting in fundamental fairness to hold an appellant responsible for a never-ending chain of causes and effects. Thus, the primary legal challenge we face is to determine where the line should be drawn in the case at bar.

ian jurisdiction which limits the information contained in its presentencing reports by applying tort principles of "proximate cause" or "causal connection". Assuming *arguendo*, that such a jurisdiction does exist, we choose not to follow its precedent. We note that even in interpreting the pre-1984 presentencing rules, the Army Court of Military Review only required that "[t]he type of aggravating matter ... go to the particular offense of which an accused has been convicted"; that is, the aggravating evidence must not be "unconnected" with the offense at issue. *United States v. Peace*, 49 CMR 172, 173 (ACMR 1974). We believe it is clear that the court was not referring to the tort concept of "causal connection" when it used the word "unconnected" in formulating its general rule for admission of aggravation under paragraphs 70 and 75b, MCM, 1969. *But compare* the discussion of *United States v. Peace* by the Court of Military Appeals in *United States v. Vickers*, 13 M.J. 403.

Regardless of the court's conclusions in *Peace*, we must now construe RCM 1001(b)(4) in light of the Presidential intent behind its promulgation. We believe the requirement that the aggravating evidence must directly relate to or result from the offenses of which an accused was convicted is only the *threshold* for determining admissibility. Once this threshold is reached, the burden falls upon the military judge, in his sound discretion, to determine whether the proffered evidence is relevant.[4] Thereafter, following a timely and specific objection based on MRE 403, the military judge also will apply the MRE 403 balancing test

before admitting the document in evidence.[5]

We believe that by establishing the above procedures, we have provided a fundamentally fair method for determining the admissibility of matters in aggravation during the presentencing process. We, therefore, need not supplement this process by injecting therein an overly paternalistic interpretation of RCM 1001(b)(4).

■ Taking the above factors into account, we believe that *the provisions of RCM 1001(b)(4)*, which provide that the aggravating evidence directly relate to or result from the offenses of which the accused has been found guilty, *only require, as a threshold, a reasonable linkage between the offense and alleged effect thereof.* The linkage between the appellant's offense and the aggravating circumstances is sufficiently established when the offenses reasonably can be shown to have contributed to those effects which the government is trying to introduce in evidence. Facts sufficient to constitute proximate cause are not required; neither is a so-called "but for" test.

Because the defense counsel expressly argued at trial a lack of an adequate connection between the aggravating evidence and appellant's offense of drug distribution, we are satisfied that the ruling of the military judge inherently included a determination that such a reasonable linkage had been established.

The test to be used in resolving the case at bar is not whether this court would have admitted this evidence in aggravation at the trial level; rather, the proper test is

---

**4.** Evidence is relevant within the meaning of RCM 1001(b)(4) when it is "important to the determination of a proper sentence". *United States v. Arceneaux*, 21 M.J. at 572. It is "important to the determination" when it has any tendency to make the existence of any fact that is of consequence to the determination of a proper sentence more or less probable. MRE 401; *cf. United States v. Harrod*, 20 M.J. at 779 (If relevant to the determination of an appropriate sentence ... such evidence is admissible.). For example, it is possible to have evidence which meets the threshold for admissibility but which is too remote, either in time or in its

linkage with the offense at bar, to be probative of the issue of "proper sentence". Such evidence would not be relevant. We believe that the military judge is in the best position to make these types of decisions, and his decisions should not be treated lightly.

**5.** The military judge may apply *sua sponte* the MRE 403 balancing test prior to admitting aggravating evidence during presentencing whenever he elects in his sound discretion to do so. *See United States v. Green*, 21 M.J. 633.

whether the military judge has abused his discretion. *Cf. United States v. Shields*, 20 M.J. 174, 176 (CMA 1985) (MRE 403 balancing test determinations are matters in the sound discretion of the trial judge); *United States v. Mukes*, 18 M.J. 358, 359 (CMA 1984) (the appellant has the burden of going forward with conclusive argument that the judge abused his discretion in applying the MRE 403 balancing test); *United States v. Wright*, 20 M.J. 518, 521 (ACMR 1985) (MRE 403 balancing test issue).

■ We find that appellant has failed to meet his burden. We are not persuaded, based on our examination of the evidence of record, that the military judge abused his discretion in this matter. In addition, we find as a fact that Private Rodrigues was, at the time of his assaultive conduct, under the influence of the ingested drugs which he had purchased from appellant. We also find that Private Rodrigues' drug impairment directly and substantially contributed to this assaultive conduct.[6] Thus, we independently conclude that a reasonable linkage has been established between appellant's offense of drug distribution and the drug purchaser's assaultive conduct later that evening.[7, 8]

Accordingly, we find this assignment of error to be without merit.

We have considered the other issues raised personally by appellant and his counsel and find them to be without merit.

6. We expressly note that it was stipulated at trial that all the individuals who were involved with Rodrigues opined that his behavior was abnormal, that he appeared not to be himself, that his eyes appeared glassy, and that he did not speak or say anything during the attack.

7. We further independently conclude that the aggravating matters received in evidence were relevant, and that the probative value of this evidence substantially outweighs any danger its admission might pose to appellant's fair trial rights within the meaning of MRE 403.

8. We expressly note that the tort concept of "foreseeability" is not applicable to the provisions of RCM 1001(b)(4). It is well known both in our world-wide military community and in

The findings of guilty and the sentence are affirmed.

Judge CARMICHAEL and Judge ROBBLEE concur.

the civilian community of our Nation that people who ingest drugs can on occasion react in a bizarre, dangerous, and violent manner, and that this behavior is often unpredictable. Drug dealers know or reasonably can be expected to know this fact (and for that matter the fact that many users of LSD are permanently mentally or physically injured as a result of their drug ingestion). Accordingly, it would not be "unjust" to hold them accountable in imposing sentencing, when such results are reasonably linked to their criminal drug distribution activities—even in the face of a claim of "unforeseeability". *Cf. United States v. Sargent*, 18 M.J. 331, 339 (CMA 1984) (Of course, where death results from sale or transfer of a drug, occurrence of the death is an aggravating circumstance in a prosecution for the sale or transfer.).