*267 Judge STUCKY
delivered the opinion of the Court.
Appellant was convicted of involuntary manslaughter while perpetrating an offense directly affecting the person of LK by aiding or abetting her wrongful use of a controlled substance. Article 119(b)(2), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 919(b)(2) (2006). We granted review to determine whether Appellant’s conviction is legally insufficient because Appellant’s distribution of the controlled substance was not an “offense ... directly affecting the person.” Additionally, we specified a related legal sufficiency issue — whether a civilian's use of a controlled substance is an “offense” under federal or state law sufficient to support a conviction for involuntary manslaughter via aiding and abetting the civilian’s wrongful use of drugs under Article 119(b)(2), UCMJ. We hold that Appellant’s conduct was not an offense directly affecting the person as envisioned by Congress, or as interpreted by this Court’s precedent. Therefore, Appellant’s conviction for involuntary manslaughter under Article 119(b)(2), UCMJ, is legally insufficient; we need not reach the specified issue.
I.
A military judge, sitting as a general court-martial, convicted Appellant, contrary to his pleas, of involuntary manslaughter by aiding and abetting in violation of Article 119(b)(2), UCMJ, but acquitted him of involuntary manslaughter by culpable negligence under Article 119(b)(1), UCMJ.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for seventy months, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade, but granted him 360 days of confinement credit. The United States Army Court of Criminal Appeals (CCA) affirmed the findings and sentence in a per curiam opinion. United States v. Bennitt, No. 20100172 (A.Ct.Crim.App. May 16, 2012) (per curiam).
II.
LK, Appellant’s sixteen-year-old girlfriend, died of an overdose in Appellant’s barracks room sometime in the early morning hours of February 15, 2009. Appellant originally claimed that he picked LK and her friend TY up after they had been doing drugs, brought them to his barracks room, snorted a pill with them, fell asleep, and woke up to find LK pale and cold next to him.
A few days later, Appellant changed his story, admitted to a number of distribution and use offenses, and gave a different version of what happened to LK. Most of the facts used to convict Appellant stem from this statement. A few members of Appellant’s unit asked him on February 14, 2009, to get pills for them. Appellant told them he had heard of a new drug, Opana,[2] from LK and knew he could get some from her neighbor Evelyn. Appellant went to Evelyn’s house, tried an Opana pill, and bought a few pills to distribute in the barracks. Later that evening, he went back to Evelyn’s house to buy more pills and pick up LK. While Appellant was at Evelyn’s house, LK came over and borrowed money from him to buy Xanax from Evelyn. Appellant claimed that he saw LK snort Opana while she was at Evelyn’s house. TY, LK’s friend, also testified that she and LK had taken drugs earlier in the day, including Opana, without Appellant.
After purchasing drugs at Evelyn’s house the second time, Appellant drove LK and TY back to the barracks with him. At the barracks, Appellant crushed two of the Opana pills and snorted them while LK took some Xanax. LK then asked him if she and TY could have one of the Opana pills, Appellant replied “yes,” crushed the pill on the nightstand for them, and divided it with a card from his wallet. The girls then snorted the crushed pill using a dollar bill. Shortly *268 thereafter, Appellant made a few telephone calls to find some marijuana for a friend, but was unsuccessful. He then left the girls in his barracks room to meet with his friend to tell him that he could not find any marijuana. When he returned to his barracks room, he found the girls sleeping in his bed. Appellant laid down next to the girls, fell asleep, and woke up a couple hours later to find LK unresponsive. He went to the Charge of Quarters to call 911. Medics were unable to revive LK, and TY had to be taken to the hospital because she had overdosed as well. A Government witness, Dr. Levine, testified that the combination of Xanax and Opana can account for death, but testified that “within a reasonable degree of scientific certainty” the Opana was the “much bigger player” in LK’s death.
III.
This Court reviews questions of legal sufficiency de novo. United States v. Green, 68 M.J. 266, 268 (C.A.A.F.2010). “The test for legal sufficiency is ‘whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ” United States v. Vela, 71 M.J. 288, 286 (C.A.A.F.2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). This Court reviews questions of law such as the interpretation and statutory construction of Article 119(b)(2), UCMJ, de novo. United States v. Lopez de Victoria, 66 M.J. 67, 73 (C.A.A.F.2008).
IV.
Appellant was charged under Article 119(b), UCMJ, which reads:
(b) Any person subject to this chapter who, without an intent to kill or inflict great bodily harm, unlawfully kills a human being—
(1) by culpable negligence', or
(2) while perpetrating or attempting to perpetrate an offense, other than those named in [Article 118(4), UCMJ], directly affecting the person;
is guilty of involuntary manslaughter and shall be punished as a court-martial may direct.
Emphasis added.
The Specification at issue read:
CHARGE I: VIOLATION OF THE UCMJ, ARTICLE 119
SPECIFICATION 2: In that [Appellant], did, at or near Fort Lewis, Washington, between on or about 14 February 2009 and on or about 15 February 2009, while perpetrating an offense directly affecting the person of [LK], to wit: wrongful use of Oxymorphone, a Schedule II controlled substance and Alprazolam, a Schedule IV controlled substance, unlawfully kill [LK] by aiding or abetting her wrongful use of Oxymorphone and Alprazolam.
Emphasis added.[3]
As alleged, Appellant was charged with involuntary manslaughter on the theory that his aiding and abetting of LK’s wrongful drug use constituted an “offense ... directly affecting the person.”
As a threshold matter, we hold that aiding and abetting the wrongful use of drugs is a viable offense under the UCMJ, as there is no evidence that Congress intended Article 112a, UCMJ, to preempt the entire universe of possible charges involving drugs, and nothing in the plain language or history of Article 77, UCMJ, 10 U.S.C. § 877 (2006), excludes wrongful use of a controlled substance as an object of aiding and abetting.[4]
*269 Having determined that aiding and abetting the wrongful use of drugs is generally a viable offense, we turn to whether such an offense is an “offense ... directly affecting the person” under Article 119(b)(2), UCMJ. The answer to this question depends on Congress’s intended meaning of an “offense ... directly affecting the person,” which was discussed by this Court’s predecessor in United States v. Sargent, and this Court’s application of dicta in Sargent suggesting that certain types of physical assistance in injecting or ingesting a drug may constitute an offense directly affecting the person for purposes of Article 119(b)(2), UCMJ. 18 M.J. 331, 335-39 (C.M.A.1984).
A.
In Sargent, this Court’s predecessor extensively discussed the intended scope of Article 119(b)(2)’s language “while perpetrating or attempting to perpetrate an offense ... directly affecting the person.” Sargent, 18 M.J. at 335-38. We reiterate much of the Sargent Court’s interpretation of the intended scope of Article 119(b)(2), UCMJ, and come to the same conclusion — “that a conviction for involuntary manslaughter cannot be sustained solely by evidence that an accused sold someone a drug and that the purchaser later died from an overdose of that drug.” Id. at 339. The legislative history of Article 119(b), UCMJ, supports this conclusion.
Article of War 93, the primary predecessor to Article 119, UCMJ, did not define manslaughter beyond stating that “[a]ny person subject to military law who commits manslaughter ... shall be punished as a court-martial may direct.” The Articles of War (Government Printing Office 1920); Hearings on H.R. 2498 Before a Subcomm. of the H. Comm, on Armed Servs., 81st Cong. 1232 (1949), reprinted in Index and Legislative History, Uniform, Code of Military Justice (1950) (not separately paginated) [hereinafter Legislative History]. The 1917 Manual for Courts-Martial (MCM), defined involuntary manslaughter as “homicide unintentionally caused in the commission of an unlawful act not amounting to a felony, nor likely to endanger life, or by culpable negligence in performing a lawful act, or in performing an act required by law.” MCM 253 (1917 ed.). Under the 1917 MCM, involuntary manslaughter in the commission of an unlawful act must have been malum in se and not merely ma-lum prohibitum. Id. For example, “the driving of an automobile in slight excess of the speed limit ... is not the kind of unlawful act contemplated,” but “voluntarily engaging in an affray” or using “an immoderate amount of force in suppressing a mutiny” were unlawful acts considered malum in se. Id.
The 1921 MCM defined involuntary manslaughter based upon the statutory definition in the Federal Penal Code — an “unlawful killing ... [i]n the commission of an unlawful act not amounting to a felony ...,” but the ensuing discussion was identical to the 1917 version.[5] MCM ¶ 443, at 414 (1921 ed.); Federal Penal Code of 1910, § 274, Pub.L. No. 63-350, 35 Stat. 1088,1143 (Act of March 4,1909).
The 1928 MCM did not refer specifically to federal statutes to define manslaughter, but defined involuntary manslaughter as a “homicide unintentionally caused in the commission of an unlawful act, not amounting to a felony, nor likely to endanger life, or by culpable negligence in performing a lawful act .... ” MCM ¶ 149a, at 165 (1928 ed.). It also substituted the 1917 and 1921 MCMs’ discussion of malum in se versus malum prohibitum acts with an equivalent statement — “[i]n involuntary manslaughter in the commission of an unlawful act, the unlawful act must be evil in itself by reason of its inherent nature and not an act which is wrong only because it is forbidden by statute or orders.” Id. at 166. The rest of the discussion of involuntary manslaughter followed the earlier MCMs. Id. The 1949 MCM deleted the words “not amounting to a felony,” but otherwise re *270 mained the same. MCM ¶ 180a, at 234 (1949 ed.).
The 1951 MCM redefined involuntary-manslaughter as: “an unlawful homicide committed without an intent to kill or inflict great bodily harm; it is an unlawful killing by culpable negligence, or while perpetrating or attempting to perpetrate an offense other than burglary, sodomy, rape, robbery, or aggravated arson, directly affecting the person.” MCM ¶ 198b, at 354 (1951 ed.) (emphasis added). An offense directly affecting the person was defined as “one affecting some particular person as distinguished from an offense affecting society in general.” Id. at 355. It provided some examples of offenses directly affecting the person: “the various types of assault, battery, false imprisonment, voluntary engagement in an affray, the use of more force than is reasonably necessary in the suppression of a mutiny or riot, and maiming.” Id. The 2008 MCM, under which Appellant was charged, is substantially similar to the 1951 version. MCM pt. IV, ¶ 44.c.(2)(b) (2008 ed.).
It is unclear why Congress redefined involuntary manslaughter in the 1951 MCM, and to what extent it intended to preserve the distinction between unlawful acts that are inherently evil and unlawful acts that are wrong only because of a statute or order (i.e., malum in se versus malum prohibitum). The Judge Advocate General of the Army at the time, Major General Thomas H. Green, thought that requiring in the article “that the act be one ‘directly affecting the person’ is misleading and perhaps too restrictive.” Legislative History, supra, at 276; 96 Cong. Ree. 1307 (1950), reprinted in 2 Index and Legislative History to the Uniform Code of Military Justice, 1950 1962 (1985). In an attempt to avoid this confusion, Senator To-bey unsuccessfully proposed that the language be amended, in keeping with the previous MCMs, to read: “Any person subject to this code who unintentionally kills a human being in the commission of a culpably negligent act or in the commission of an act wrongful in itself but not inherently dangerous to life is guilty of involuntary manslaughter....” Id.
Aside from this failed amendment, the Legal and Legislative Basis for the 1951 MCM provides some background for the change in definition:
As far as the offense of involuntary manslaughter is concerned, the terminology used in Article 119 to define the offense differs considerably from the common law terminology, but in substance the difference in definition is not very great. Under the common law, as under Article 119(b)(1), the first of the two types of involuntary manslaughter arises from culpable negligence. The second type of involuntary manslaughter at common law arises from the commission of a criminal act malum in se but not amounting to a felony of a kind which would naturally tend to cause death or great bodily harm to another person .... the phrase “directly affecting the person” is the result of an endeavor to define the distinction between malum in se and malum prohibitum. The phrase “affecting the person” may be found in Section 1050 of the New York Penal Law which contains a comparable provision with respect to involuntary manslaughter.[6]
Charles L. Decker et al., Dep’t of Defense, Legal and Legislative Basis, Manual for Courts-Martial, United States 270 (1951) (emphasis added).
*271 Based upon this language, we conclude that Congress intended to retain, at least to some degree, the distinction between inherently evil acts (malum in se) and acts evil because they are forbidden by statute or order (malum prohibitum), and to limit “offense[s] ... directly affecting the person” to those in which physical force is applied directly against an individual’s body. Under the various MCMs in force prior to the UCMJ, involuntary manslaughter could only be committed via a malum in se offense. The last military precedent addressing this distinction held that drug offenses were ma-lum prohibitum. United States v. Cavett, 18 C.M.R. 793, 795 (A.F.B.R.1955), rev’d on other grounds, 6 USCMA 235, 19 C.M.R. 361 (1955).[7] Furthermore, in line with the language of the UCMJ, drug distribution is generally not within the intended scope of Article 119(b)(2), UCMJ, as it is more akin to an offense affecting society in general, rather than an offense like battery, maiming, or assault that affects a particular person. MCM pt. IV, ¶ 44.d.2(b) (2008 ed.).
Therefore, it appears that Congress did not intend for drug distribution to constitute an offense directly affecting the person such that it could support an involuntary manslaughter conviction. However, this Court’s predecessor suggested in Sargent that under some circumstances drug distribution may constitute an “offense ... directly affecting the person.” 18 M.J. at 339. Therefore, we will address the application of Sargent to this ease.
B.
Sargent specifically addressed “whether a sale of a prohibited substance constitutes an offense ‘directly affecting the person’ of the purchaser within the meaning of Article 119(b)(2), UCMJ.” 18 M.J. at 332. The accused in Sargent was found guilty of involuntary manslaughter after he sold heroin to a private who died after snorting it. Id. This Court overturned the accused’s conviction for manslaughter because his conduct was not an offense directly affecting the person. Id. at 335-39; see also United States v. Dillon, 18 M.J. 340, 342-43 (C.M.A.1984) (holding that the accused could not be guilty of manslaughter because distributing cocaine was not an offense directly affecting the person).
We interpreted an “offense ... directly affecting the person” to be “situations in which physical force is applied immediately against an individual’s body.” Sargent, 18 M.J. at 338-39 (“[W]e conclude that a conviction for involuntary manslaughter cannot be sustained solely by evidence that an accused sold someone a drug and that the purchaser later died from an overdose of that drug.”). However, in a dictum we left the door open as to whether steps beyond distribution could constitute an offense directly affecting the person.
On the other hand, when the seller has gone further and assisted the purchaser in injecting or ingesting the drug, the sale becomes one which does directly affect the person for purposes of Article 119(b)(2). Furthermore, because assisting someone to inject or ingest a drug constitutes aiding and abetting use of the drug and because such use is “an offense directly affecting the person,” this prerequisite for Article 119(b)(2)’s application is present under those circumstances.
Id. at 339 (emphasis added). Like the Sargent court, we assume without deciding that under the right circumstances the distribution of drugs could constitute an offense directly affecting the person such that a conviction under Article 119(b)(2), UCMJ, could be legally sufficient.[8] However, in light of *272 the intended scope of Article 119(b)(2), UCMJ, discussed above, we hold that Appellant’s conduct does not constitute physical assistance such that it is an offense directly affecting the person. We therefore find Appellant’s conviction for involuntary manslaughter to be legally insufficient.
V.
The judgment of the United States Army Court of Criminal Appeals is reversed as to Specification 2 of Charge I and the sentence, but is affirmed in all other respects. The finding of guilty as to Specification 2 of Charge I is set aside and Specification 2 of Charge I is dismissed. The record of trial is returned to the Judge Advocate General of the Army for submission to that court for reassessment of the sentence, or that court may order a rehearing on the sentence.

. Although, irrelevant to this appeal, Appellant also pled guilty to and was convicted of four specifications each of wrongful distribution of a controlled substance, and wrongful use of a controlled substance in violation of Article 112a, UCMJ, 10 U.S.C. § 912a (2006).

. Opana is an opioid containing oxymorphone intended for use as a painkiller. Opana ER, http://www.opana.com (last visited April 16, 2013).

. Appellant was also charged with a separate involuntary manslaughter specification via Article 119(b)(1), alleging that Appellant was culpably negligent for LK’s death because he had obtained the pill, and provided the pill, room, and device to ingest the pill to LK knowing that she was sixteen years old, had taken drugs earlier that evening, and had a propensity to abuse drags. The military judge acquitted Appellant of this specification.

. This general holding does not answer the more narrow specified issue — whether Appellant’s conviction is legally insufficient because LK’s use was not an offense under federal or state law.

. Section 119 of Naval Courts and Boards, 1937, another predecessor to Article 119(b), also referenced the Federal Penal Code definition, and followed the Army MCMs’ distinction between malum in se and malum prohibitum. Naval Courts and Boards, 1937 § 119 (Government Printing Office 1945).

. Former § 1050 of the New York Penal Law defined manslaughter in the first degree as a homicide by a "person engaged in committing, or attempting to commit, a misdemeanor, affecting the person or property, either of the person killed, or another.” People v. Grieco, 266 N.Y. 48, 193 N.E. 634, 635 (1934). The New York Court of Appeals interpreted this to mean that the misdemeanor had to affect "some particular person or property” rather than "a misdemeanor affecting society in general.” Id. at 636 (overturning a defendant’s conviction for manslaughter where he accidentally hit and killed a woman while driving drunk). Consistent with Grieco, the 1951 MCM explained that an "offense directly affecting the person is meant one affecting some particular person as distinguished from an offense affecting society in general.” MCM ¶ 199a, at 355 (1951 ed.). The 2008 version maintains this language. MCM pt. IV, ¶ 44.-c(2)(b) (2008 ed.).

. It appears there was a general shift in the 1970s to view anti-narcotic laws as malum in se. But, at least one state court has recently found they are malum prohibitum. State v. Anderson, 654 N.W.2d 367, 370-71 (Minn.Ct.App.2002), rev’d on other grounds, 666 N.W.2d 696 (Minn.2003).

. While the circumstances present in this case might have supported a conviction for involuntary manslaughter via culpable negligence under Article 119(b)(1), UCMJ, the Appellant was acquitted of such a charge. See United States v. Henderson, 23 M.J. 77, 80 (C.M.A.1986) (finding a conviction for involuntary manslaughter under Article 119(b)(1), UCMJ, legally sufficient where the accused had distributed a large amount of cocaine to someone known to abuse cocaine to the point of harm).