UNITED STATES, Appellee,

v.

Garry L. HENDERSON, Specialist Four
U.S. Army, Appellant.

No. 48701.
CM 443406.

U.S. Court of Military Appeals.

Nov. 10, 1986.

For Appellant: *Captain David L. Carrier* (argued and reargued); *Colonel William G. Eckhardt, Lieutenant Colonel Arthur L. Hunt, Major Robert M. Ott, Captain Peter L. Yee* (on brief); *Major Joel D. Miller.*

For Appellee: *Major Byron J. Braun* (reargued) and *Captain Andrew D. Stewart* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Major Thomas J. LeClair, Captain Charles S. Arberg* (on brief); *Colonel Norman G. Cooper, Lieutenant Colonel John T. Edwards, Lieutenant Colonel Gary F. Roberson.*

*Opinion of the Court*

COX, Judge:

Contrary to his pleas, appellant was convicted by a military judge sitting alone as a

general court-martial of involuntary manslaughter, false swearing, sale of cocaine, and two specifications of transfer of cocaine, in violation of Articles 119 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 919 and 934, respectively. His sentence to confinement for 119 months, forfeiture of all pay and allowances, reduction to E–1, and a dishonorable discharge was approved by the convening authority. The Court of Military Review affirmed the findings and sentence in an unpublished opinion.

We granted review of the following issue:

WHETHER THE EVIDENCE IS SUFFICIENT AS A MATTER OF LAW TO SUSTAIN A FINDING OF GUILTY AS TO THE SPECIFICATION OF CHARGE I (INVOLUNTARY MANSLAUGHTER).

Finding the evidence to be legally sufficient, we affirm.

Appellant was convicted of involuntary manslaughter by culpable negligence under Article 119(b)(1) on the basis of a specification reading as follows after findings:

In that Specialist Four Garry L. Henderson, US Army, Medical Company B, Tripler Army Medical Center, did, at Tripler Army Medical Center, Hawaii, an installation under military control, on or about 16 June 1981, by culpable negligence unlawfully kill Specialist Four Myers W. Hickman, a member of Medical Company B, Tripler Army Medical Center, by making available to the said Specialist Four Myers W. Hickman a large quantity of cocaine, then knowing of Specialist Four Myers W. Hickman's propensity to abuse cocaine and then knowing that the said Specialist Four Myers W. Hickman would inject a large amount of the cocaine into his body; by permitting the said Specialist Four Myers W. Hickman to utilize his (the accused's) room in which to inject the drugs into his body.

The Government had the burden of proving beyond a reasonable doubt that the following occurred:

(1) Myers W. Hickman was dead;

(2) his death resulted from the acts of appellant, as alleged; and

(3) appellant's acts constituted culpable negligence.

Para. 198b, Manual for Courts-Martial, United States, 1969 (Revised edition).

Without question, the Government proved that Myers Hickman was dead and that his death resulted from an overdose of cocaine. Appellant disputes, however, the sufficiency of the evidence either to establish a causal connection between appellant's acts and the death or to establish that appellant was culpably negligent.

I

The evidence showed that appellant reported finding the unconscious body of Hickman lying on the lanai (veranda) adjacent to appellant's barracks room at approximately 0900 hours on June 16, 1981. A small amount of blood was observed around the mouth, where a tooth was chipped and the lower lip lacerated. Emergency rendering of first aid and cardiopulmonary resuscitation was unsuccessful and Hickman was pronounced dead-on-arrival at the Army hospital. An autopsy revealed the cause of death was cocaine intoxication. A forensic pathologist testified that the high levels of cocaine found in Hickman's body were usually fatal.

Appellant often supplied cocaine to his enlisted friends at Tripler Army Medical Center. The decedent was one of these friends. On June 15, the day before Hickman's death, Hickman told Specialist Four Carl Youney that he had run "into a whole lot of cocaine and" was going to a party that night. According to Youney, Hickman injected cocaine whenever it was available to him and had "almost killed himself" before by overdosing on cocaine. During the week before his death, Hickman had been depressed and had discussed suicide with several friends.

On the evening of June 15, Hickman and a group of friends gathered at appellant's off-post apartment. Appellant mentioned to Private First Class Cynthia Scovel that

Hickman was in a back room shooting up cocaine and saying that he was going to die. To her expression of concern, appellant commented that Hickman was a big boy.

Hickman left appellant's apartment late that evening to report for duty as an operating room technician. The next morning, appellant and Hickman were seen together in the barracks. They came by the room of Dean Peters around 0745 hours and asked him if he wanted to "party" with them, stating that they were "going to go get fired up." Peters declined their invitation. A short while later, Hickman was dead.

Although the record does not reveal who injected the lethal dose of cocaine into Hickman's body, appellant's admissions provided support for the Government's theory that appellant provided Hickman with the cocaine used to overdose and that appellant was present when it was injected. Appellant called Timothy Wagoner on the morning of June 16 to tell him what had happened in the barracks. He related that Hickman had overdosed and that he had carried him out on the lanai. He asked Wagoner to keep a bag containing ten grams of cocaine for him, as appellant "felt ... the heat was on him." Appellant also told his barracks roommate that he had provided Hickman with cocaine the night before his death.

Bloodstains and a portion of a tooth broken out of Hickman's mouth were found on the floor of appellant's room in the barracks, providing circumstantial evidence that appellant moved Hickman's unconscious body from appellant's room to the lanai after Hickman collapsed. According to medical testimony, Hickman most likely collapsed immediately after injecting the fatal dose of cocaine, with brain death occurring within 5 minutes.

When announcing findings, the military judge stated:

I could not find beyond a reasonable doubt that a sale of cocaine occurred between the accused and Myers W. Hickman on or about 15 June. I did find beyond a question of a doubt, however, that the accused made available to Myers Hickman sufficient quantities of cocaine that once ingested caused the death of Myers Hickman.

II

■ Appellant maintains that the evidence fails to establish that he was the source of the fatal dose of cocaine. The military judge's finding that appellant "made available" cocaine to Hickman under the facts of this case is equivalent to a finding that appellant "provided," "supplied," or "furnished" the illegal drug to Hickman. Although there was no direct evidence on this point, there is competent circumstantial evidence from which the military judge could have found beyond a reasonable doubt that appellant furnished Hickman the fatal dose. As pointed out by appellate government counsel:

Considering that appellant provided Hickman cocaine the night before Hickman's death, that the two were together that night and early the next morning, and that appellant possessed cocaine that morning, it is implausible that any other person supplied Hickman's fatal dose of cocaine.

■ Appellant further argues that, even assuming he did provide the cocaine which Hickman used to overdose, this was not a culpably negligent act. Culpable negligence is defined as

a degree of carelessness greater than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission. Thus, the basis of a charge of involuntary manslaughter may be a negligent act or omission which, when viewed in the light of human experience, might foreseeably result in the death of another, even though death would not, necessarily, be a natural and probable consequence of the act or omission.

Para. 198*b*, Manual, *supra*.

Therefore, it is not necessary that appellant in fact foresaw a fatal outcome. The

test is whether a reasonable person, in view of all the circumstances, would have realized the substantial and unjustifiable danger created by his acts or omissions. *United States v. Brown,* 22 M.J. 448 (C.M. A.1986). *See United States v. Mazur,* 13 M.J. 143, 145 (C.M.A.1982) (Everett, C.J., concurring).

█ The fact that cocaine has been designated a controlled substance by Congress, standing alone, means that it has been determined to be potentially harmful, that it will only be available illicitly, and that there will be a lack of quality control. Furthermore, merely providing a controlled substance is "an act inherently dangerous to human life." *See United States v. Sargent,* 18 M.J. 331, 339 n. 6 (C.M.A.1984), *quoting United States v. Moglia,* 3 M.J. 216, 217 (C.M.A.1977). *See generally* Annot., 32 A.L.R.3d 589 (1970). Specifically, the unlawful furnishing of cocaine is conduct "inherently dangerous to human life." *See Heacock v. Commonwealth,* 228 Va. 397, 323 ₊S.E.2d 90 (1984).[1] In *United States v. Ettleson,* 13 M.J. 348, 361 n. 15 (C.M.A.1982), this Court referred to "the noxious effects of cocaine," citing statistics from the Centers for Disease Control to demonstrate the increase in "the rate of cocaine-related deaths" and emergencies between 1976 and 1980.

Thus, appellant's act of unlawfully making available cocaine, a restricted drug, to Hickman is compelling evidence of his culpable negligence. Moreover, it is clear that appellant knew of Hickman's propensity to use cocaine excessively and recklessly. Only the night before, Hickman spoke of dying from the same substance.[2] In view of all the information available, appellant knew or should have known the risk he created by making available a large quantity of cocaine to Hickman to inject.

Although appellant may not have personally inserted the needle into Hickman's arm, he nevertheless assisted Hickman's wrongful use of the cocaine that killed him.[3] *See* para. 156, Manual, *supra.* Appellant actively aided and abetted the injection of the lethal dose by making available a large quantity of cocaine knowing it would be injected, by permitting the privacy of his room to be utilized for the injection, by encouraging the decedent to "get fired up," and by his presence during the consumption of the cocaine.[4] We conclude

---

1. In *Heacock v. Commonwealth,* 228 Va. 397, 323 S.E.2d 90 (1984), it was held as a matter of law that the unlawful distribution of cocaine is conduct potentially dangerous to human life, for purposes of determining whether one who feloniously distributes cocaine is guilty of second-degree murder when the recipient dies of an overdose. The Virginia statute defines murder in the second degree as "[t]he killing of one accidentally ... while in the prosecution of" a felony "other than those specified in" the first-degree and capital-murder statutes. Code § 18.- 2-33. In *Heacock,* as in the present case, the record did not show who administered the fatal injection. *But see State v. Aarsvold,* 376 N.W.2d 518 (Minn.App.1985) (sale of cocaine not appropriate felony on which to base felony-murder under Minnesota statute).

2. Although Hickman discussed suicide in the week before his death, the evidence does not establish that he intended to commit suicide or that appellant caused the death in the execution of some sort of suicide pact. *Cf. United States v. Varraso,* 21 M.J. 129 (C.M.A.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1645, 90 L.Ed.2d 190 (1986) (murder conviction upheld where accused's acts were proximate cause of death, even if decedent intended to commit suicide).

3. Convictions of involuntary manslaughter under Article 119(b)(1), Uniform Code of Military Justice, 10 U.S.C. § 919(b)(1), have been routinely upheld where the culpable negligence consisted of somehow assisting the victim to illegally use a restricted drug. *See United States v. Dinkel,* 13 M.J. 400 (C.M.A.1982) (assisted injection of heroin by holding victim's arm); *United States v. Mazur,* 13 M.J. 143 (C.M.A.1982) (assisted victim to inject heroin); *United States v. Romero,* 1 M.J. 227 (C.M.A.1975) (helped victim insert syringe of heroin into vein); *United States v. Monroe,* 50 C.M.R. 423 (N.C.M.R.1975) (furnished heroin and means for injecting it); *United States v. Uno,* 47 C.M.R. 683 (A.C.M.R.1973) (furnished opium and helped victim prepare it for injection); *United States v. Thibeault,* 43 C.M.R. 704 (A.C.M.R.1971), *pet. denied,* 20 U.S.C.M.A. 671, 43 C.M.R. 413 (1971) (injected victim with epinephrine).

4. Thus, it is unnecessary for us to decide whether the sole act of distributing (or "making available" or "furnishing") a controlled substance to a person who uses it and dies as a result would constitute culpable negligence *per se.*

that the evidence is sufficient as a matter of law to establish appellant's culpable negligence.[5]

The decision of the United States Army Court of Military Review is affirmed.

Judge SULLIVAN concurs.

EVERETT, Chief Judge (dissenting):

By an effective use of circumstantial evidence the Government established that: on June 15, 1981, appellant made available a substantial amount of cocaine to Myers W. Hickman, a fellow soldier who lived in the same barracks; around 7:45 a.m. on the morning of June 16, the two men went to appellant's room where Hickman injected himself with cocaine; a few minutes later Hickman collapsed because of a cocaine overdose; appellant dragged Hickman a few yards to the lanai—an open porch-like area of the barracks—just outside his room; shortly thereafter appellant summoned help and falsely claimed that he had come across the body which was lying on the lanai; and when help arrived, Hickman was dead. The issue here is whether, in light of these circumstances, Henderson was "culpably negligent," and therefore liable for involuntary manslaughter under Article 119(b)(1), Uniform Code of Military Justice, 10 U.S.C. § 919(b)(1).

As the majority opinion points out, culpable negligence "is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission." Moreover, furnishing someone a controlled substance, such as cocaine, "provides some evidence of culpable negligence." *See United States v. Sargent,* 18 M.J. 331, 339 n.6 (C.M.A.1984). My difference with the majority opinion is that, although the evidence in this case probably would sustain a conviction of negligent homicide under Article 134, UCMJ, 10 U.S.C. § 934, it did not, in my view, suffice to establish the culpable negligence requisite to convict appellant of involuntary manslaughter.

In evaluating the sufficiency of the evidence, it is important to remember that this death did not occur in 1986 but instead in 1981. At that time, there was some question as to whether sale, use, and possession of cocaine were punishable offenses under the Uniform Code of Military Justice, *see United States v. Ettleson,* 13 M.J. 348 (C.M.A.1982). Furthermore, at that time deaths from overdoses of cocaine were very rare in the armed services. Commander Jerry Spencer, a doctor assigned to the Armed Forces Institute of Pathology at the Walter Reed Medical Center, testified as an expert government witness that Hickman's death was the only one due to an overdose of cocaine which had been reported to the Institute in 1981. As of the time of trial in 1982, Doctor Spencer apparently was aware of only one other cocaine-related death that had occurred in the armed forces; and on that occasion the decedent had tried to smuggle cocaine in a rubber bag in his rectum and had died when some of the cocaine had leaked out.

Moreover, Henderson was not on notice of any special circumstances that would have indicated to him that Hickman's use of cocaine might be fatal. Although Hick-

---

5. *Compare People v. Edwards,* 39 Cal.3d 107, 216 Cal.Rptr. 397, 702 P.2d 555 (1985) (evidence sufficient to support involuntary-manslaughter conviction in accidental heroin overdose case based on misdemeanor-manslaughter theory where accused aided and abetted use by copurchasing drug with decedent); *State v. Randolph,* 676 S.W.2d 943 (Tenn.1984) (although seller was not present at injection, proof of sale of heroin to victim who died the next day following self-administered overdose could support conviction for second-degree murder or involuntary manslaughter); *Sheriff, Clark County v. Morris,* 99 Nev. 109, 659 P.2d 852 (1983) (felonious sale of chloral hydrate with presence of seller during consumption by buyer of lethal dose proper predicate for felony-murder); *State v. Thomas,* 118 N.J.Super. 377, 288 A.2d 32 (1972) (manslaughter conviction upheld where jury could reasonably find that regular, natural and likely consequence of sale of heroin was user's death), *with State v. Mauldin,* 215 Kan. 956, 529 P.2d 124 (1974) (felony of selling heroin alone not sufficient to fall within scope of felony-murder statute); *State v. Dixon,* 109 Ariz. 441, 511 P.2d 623 (1973) (sole act of selling heroin to purchaser who voluntarily and out of presence of seller injects lethal quantity and dies as a result does not constitute second-degree murder).

man had been sick during a party on the day before, he had subsequently performed military duty; and he appeared normal on the morning of June 16. Previously, Hickman had been somewhat despondent on one occasion and had made some reference to suicide; but, on the morning of his death, he apparently was in good spirits. There was no reason why Henderson would have anticipated on June 16, 1981, that Hickman would take an overdose of cocaine in order to kill himself; and there is no indication that, in fact, the decedent intentionally overdosed for this purpose.* Although appellant failed to aid Hickman after he collapsed and instead dragged him out on the lanai, the Government's own medical evidence revealed that this conduct had nothing to do with Hickman's death; and the military judge declined to find that the failure to summon medical assistance helped cause the death.

I recognize that sometimes criminal liability has been imposed for deaths resulting from unlawfully furnishing liquor or drugs to another, *see generally* Annot., 32 A.L.R.3d 589 (1970). In some jurisdictions where supplying certain drugs is a felony, the distributor of the drug can be convicted of murder under a common-law or statutory felony-murder rule, if his transferee uses the drug and dies as a result. *See Heacock v. Commonwealth,* 228 Va. 397, 323 S.E.2d 90 (1984). On the other hand, the Minnesota Court of Appeals held that selling cocaine did not fall within the scope of that State's felony-murder statute because

> The legislature did not create the felony of sale of cocaine because of any inherent life-threatening qualities. Rather, it was created by the legislature because cocaine has a high potential for abuse and may lead to psychological dependence. *See State v. Vernon,* 283 N.W.2d 516 (Minn.1979). Thus, although cocaine is admittedly a substance with an adverse effect on a person's health, use of cocaine, even when injected, does not

generally cause death. *See People v. Pinckney,* 65 Misc.2d 265, 317 N.Y.S.2d 416 (1971) (injection of heroin into the body does not generally in itself cause death). Because the sale of cocaine alone does not justify the assumption that the purchaser is incurring a substantial and unjustified risk of death, we hold that sale alone is not a proper felony upon which to predicate a charge of felony murder. To hold otherwise would give the felony-murder statute a broader scope than this court will impute in the absence of clear legislative intent to effectuate that meaning.

*State v. Aarsvold,* 376 N.W.2d 518, 522 (Minn.App.1985) (footnote omitted).

Under the Uniform Code of Military Justice the felony-murder rule applies only with respect to certain felonies designated in Article 118(4), 10 U.S.C. § 918(4); and drug offenses are not included there. *Cf. United States v. Jefferson,* 22 M.J. 315 (C.M.A.1986). Moreover, a seller whose transferee dies of an overdose cannot be convicted of involuntary manslaughter under Article 119(b)(2) of the Uniform Code, because death is not the result of "an offense ... directly affecting the person." *United States v. Sargent, supra* at 333, 338–39.

With respect to "culpable negligence" under Article 119(b)(1), the precedents cited in the majority opinion do not justify the conclusion that it existed in the present case. For the most part those precedents were decided under quite different statutes; or, unlike this case, they involved assistance in using a drug—such as preparing the drug for injection, injecting the needle, or holding the victim's arm. In *Heacock v. Commonwealth, supra,* not only was a felony-murder statute involved but, as the Supreme Court of Virginia noted, the defendant knew, or should have known, that the injection of the narcotic which he supplied and helped to administer to the victim was life-endangering. Only a few moments before he had seen another

---

* For a situation where the accused helped facilitate a suicide, *see United States v. Varraso,* 21 M.J. 129 (C.M.A.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1645, 90 L.Ed.2d 190 (1986).

person suffer a violent reaction upon being injected with the same substance.

In recent months, there has been increasing awareness that, in addition to cocaine's high potential for abuse and causing "psychological dependence," *see State v. Aarsvold, supra,* it may lead to immediate death. The recent drug-related deaths of prominent sports and entertainment figures, like Leonard Bias and John Belushi, have been widely reported. From the President on down, efforts have been made to inform the public that death may be caused by use of cocaine and "crack." Consequently, if the events involved in this case had occurred today—rather than in 1981—Henderson could be convicted of involuntary manslaughter, for he would be chargeable with the now almost universal knowledge that use of cocaine can cause almost instant death.

I am convinced, however, that to uphold Henderson's conviction of involuntary manslaughter is to interpret Article 119(b)(1) of the Code in a retroactive manner. It is being assumed that appellant disregarded the fatal consequences, when—as of June 16, 1981—there was no basis for imputing to appellant any such awareness of foreseeable consequences. To hold appellant liable in the present case violates his due process rights.

Retroactive application of a criminal statute is prohibited. U.S.Const. art. I, § 9, cl. 3, and § 10; *United States v. McDonagh,* 14 M.J. 415, 419 (C.M.A.1983). Similarly, there are constitutional limitations on the retroactive application of a new interpretation of a criminal statute. *Cf. Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *Bouie v. City of Columbia,* 378 U.S. 347, 352, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964). According to *Splawn v. California,* 431 U.S. 595, 601, 97 S.Ct. 1987, 1991, 52 L.Ed.2d 606, 614 (1977), *Bouie* holds that "the elements of a statutory offense may not be so changed by judicial interpretation as to deny to accused defendants fair warning of the crime prohibited." By holding that Henderson's acts and omissions in 1981 constituted "culpable negligence," the majority opinion has, in my view, retroactively applied a new interpretation of the elements of Article 119(b)(1). At that time appellant lacked "fair warning of the crime prohibited." Consequently, his due-process rights are now violated by the majority's interpretation of Article 119(b)(1).

Of course, our nation is now engaged in a war against drugs; and none of us has any sympathy for cocaine vendors. Nonetheless, under the Constitution we are bound by the statutory provisions applicable to an alleged crime when it was committed and by the evidence in the record of trial. Because my reading of the record of trial has not revealed to me the "culpable negligence" required by Article 119(b)(1), I cannot join in affirming appellant's conviction of involuntary manslaughter.