UNITED STATES, Appellee

v.

Timothy E. BENNITT, Private
U.S. Army, Appellant

No. 12-0616

Crim. App. No. 20100172

United States Court of Appeals for the Armed Forces

Argued April 2, 2013

Decided June 3, 2013

STUCKY, J., delivered the opinion of the Court, in which ERDMANN
and RYAN, JJ., and COX, S.J., joined.  BAKER, C.J., filed a
separate dissenting opinion.


Counsel


For Appellant:  Major Jacob D. Bashore (argued); Colonel
Patricia A. Ham (on brief).


For Appellee:  Captain Kenneth W. Borgnino (argued); Lieutenant
Colonel Amber J. Roach and Major Katherine S. Gowel (on brief);
Captain Chad M. Fisher.


Military Judge:  Kwasi L. Hawks


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

JUDGE STUCKY delivered the opinion of the Court.

Appellant was convicted of involuntary manslaughter while perpetrating an offense directly affecting the person of LK by aiding or abetting her wrongful use of a controlled substance. Article 119(b)(2), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 919(b)(2) (2006). We granted review to determine whether Appellant's conviction is legally insufficient because Appellant's distribution of the controlled substance was not an "offense . . . directly affecting the person." Additionally, we specified a related legal sufficiency issue -- whether a civilian's use of a controlled substance is an "offense" under federal or state law sufficient to support a conviction for involuntary manslaughter via aiding and abetting the civilian's wrongful use of drugs under Article 119(b)(2), UCMJ. We hold that Appellant's conduct was not an offense directly affecting the person as envisioned by Congress, or as interpreted by this Court's precedent. Therefore, Appellant's conviction for involuntary manslaughter under Article 119(b)(2), UCMJ, is legally insufficient; we need not reach the specified issue.

I.

A military judge, sitting as a general court-martial, convicted Appellant, contrary to his pleas, of involuntary manslaughter by aiding and abetting in violation of Article 119(b)(2), UCMJ, but acquitted him of involuntary manslaughter

by culpable negligence under Article 119(b)(1), UCMJ.[1]  The military judge sentenced Appellant to a dishonorable discharge, confinement for seventy months, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade, but granted him 360 days of confinement credit.  The United States Army Court of Criminal Appeals (CCA) affirmed the findings and sentence in a per curiam opinion.  United States v. Bennitt, No. 20100172 (A. Ct. Crim. App. May 16, 2012) (per curiam).

## II.

LK, Appellant's sixteen-year-old girlfriend, died of an overdose in Appellant's barracks room sometime in the early morning hours of February 15, 2009.  Appellant originally claimed that he picked LK and her friend TY up after they had been doing drugs, brought them to his barracks room, snorted a pill with them, fell asleep, and woke up to find LK pale and cold next to him.

A few days later, Appellant changed his story, admitted to a number of distribution and use offenses, and gave a different version of what happened to LK.  Most of the facts used to convict Appellant stem from this statement.  A few members of Appellant's unit asked him on February 14, 2009, to get pills

---

[1] Although, irrelevant to this appeal, Appellant also pled guilty to and was convicted of four specifications each of wrongful distribution of a controlled substance, and wrongful use of a controlled substance in violation of Article 112a, UCMJ, 10 U.S.C. § 912a (2006).

for them. Appellant told them he had heard of a new drug, Opana,[2] from LK and knew he could get some from her neighbor Evelyn. Appellant went to Evelyn's house, tried an Opana pill, and bought a few pills to distribute in the barracks. Later that evening, he went back to Evelyn's house to buy more pills and pick up LK. While Appellant was at Evelyn's house, LK came over and borrowed money from him to buy Xanax from Evelyn. Appellant claimed that he saw LK snort Opana while she was at Evelyn's house. TY, LK's friend, also testified that she and LK had taken drugs earlier in the day, including Opana, without Appellant.

After purchasing drugs at Evelyn's house the second time, Appellant drove LK and TY back to the barracks with him. At the barracks, Appellant crushed two of the Opana pills and snorted them while LK took some Xanax. LK then asked him if she and TY could have one of the Opana pills, Appellant replied "yes," crushed the pill on the nightstand for them, and divided it with a card from his wallet. The girls then snorted the crushed pill using a dollar bill. Shortly thereafter, Appellant made a few telephone calls to find some marijuana for a friend, but was unsuccessful. He then left the girls in his barracks room to meet with his friend to tell him that he could not find any

---

[2] Opana is an opioid containing oxymorphone intended for use as a painkiller. Opana ER, http://www.opana.com (last visited April 16, 2013).

marijuana.  When he returned to his barracks room, he found the girls sleeping in his bed.  Appellant laid down next to the girls, fell asleep, and woke up a couple hours later to find LK unresponsive.  He went to the Charge of Quarters to call 911.  Medics were unable to revive LK, and TY had to be taken to the hospital because she had overdosed as well.  A Government witness, Dr. Levine, testified that the combination of Xanax and Opana can account for death, but testified that "within a reasonable degree of scientific certainty" the Opana was the "much bigger player" in LK's death.

## III.

This Court reviews questions of legal sufficiency de novo. United States v. Green, 68 M.J. 266, 268 (C.A.A.F. 2010).  "The test for legal sufficiency is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Vela, 71 M.J. 283, 286 (C.A.A.F. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  This Court reviews questions of law such as the interpretation and statutory construction of Article 119(b)(2), UCMJ, de novo.  United States v. Lopez de Victoria, 66 M.J. 67, 73 (C.A.A.F. 2008).

                          IV.

    Appellant was charged under Article 119(b), UCMJ, which

reads:

    (b) Any person subject to this chapter who, without an
    intent to kill or inflict great bodily harm,
    unlawfully kills a human being --

        (1) by culpable negligence; or

        (2) while perpetrating or attempting to
        perpetrate an offense, other than those named in
        [Article 118(4), UCMJ], directly affecting the
        person;

    is guilty of involuntary manslaughter and shall be
    punished as a court-martial may direct.

Emphasis added.

    The Specification at issue read:

    CHARGE I: VIOLATION OF THE UCMJ, ARTICLE 119

    . . . .

    SPECIFICATION 2: In that [Appellant], did, at or near
    Fort Lewis, Washington, between on or about 14
    February 2009 and on or about 15 February 2009, while
    perpetrating an offense directly affecting the person
    of [LK], to wit: wrongful use of Oxymorphone, a
    Schedule II controlled substance and Alprazolam, a
    Schedule IV controlled substance, unlawfully kill [LK]
    by aiding or abetting her wrongful use of Oxymorphone
    and Alprazolam.

Emphasis added.[3]

_____

[3] Appellant was also charged with a separate involuntary
manslaughter specification via Article 119(b)(1), alleging that
Appellant was culpably negligent for LK's death because he had
obtained the pill, and provided the pill, room, and device to
ingest the pill to LK knowing that she was sixteen years old,
had taken drugs earlier that evening, and had a propensity to

                          6

As alleged, Appellant was charged with involuntary manslaughter on the theory that his aiding and abetting of LK's wrongful drug use constituted an "offense . . . directly affecting the person."

As a threshold matter, we hold that aiding and abetting the wrongful use of drugs is a viable offense under the UCMJ, as there is no evidence that Congress intended Article 112a, UCMJ, to preempt the entire universe of possible charges involving drugs, and nothing in the plain language or history of Article 77, UCMJ, 10 U.S.C. § 877 (2006), excludes wrongful use of a controlled substance as an object of aiding and abetting.[4]

Having determined that aiding and abetting the wrongful use of drugs is generally a viable offense, we turn to whether such an offense is an "offense . . . directly affecting the person" under Article 119(b)(2), UCMJ.  The answer to this question depends on Congress's intended meaning of an "offense . . . directly affecting the person," which was discussed by this Court's predecessor in United States v. Sargent, and this Court's application of dicta in Sargent suggesting that certain types of physical assistance in

---

abuse drugs.  The military judge acquitted Appellant of this specification.

[4] This general holding does not answer the more narrow specified issue -- whether Appellant's conviction is legally insufficient because LK's use was not an offense under federal or state law.

injecting or ingesting a drug may constitute an offense directly affecting the person for purposes of Article 119(b)(2), UCMJ. 18 M.J. 331, 335–39 (C.M.A. 1984).

A.

In Sargent, this Court's predecessor extensively discussed the intended scope of Article 119(b)(2)'s language "while perpetrating or attempting to perpetrate an offense . . . directly affecting the person." Sargent, 18 M.J. at 335–38. We reiterate much of the Sargent Court's interpretation of the intended scope of Article 119(b)(2), UCMJ, and come to the same conclusion -- "that a conviction for involuntary manslaughter cannot be sustained solely by evidence that an accused sold someone a drug and that the purchaser later died from an overdose of that drug." Id. at 339. The legislative history of Article 119(b), UCMJ, supports this conclusion.

Article of War 93, the primary predecessor to Article 119, UCMJ, did not define manslaughter beyond stating that "[a]ny person subject to military law who commits manslaughter . . . shall be punished as a court-martial may direct." The Articles of War (Government Printing Office 1920); Hearings on H.R. 2498 Before a Subcomm. of the H. Comm. on Armed Servs., 81st Cong. 1232 (1949), reprinted in Index and Legislative History, Uniform Code of Military Justice (1950) (not separately paginated) [hereinafter Legislative History]. The 1917 Manual for Courts-

8

Martial (MCM), defined involuntary manslaughter as "homicide unintentionally caused in the commission of an unlawful act not amounting to a felony, nor likely to endanger life, or by culpable negligence in performing a lawful act, or in performing an act required by law." MCM 253 (1917 ed.). Under the 1917 MCM, involuntary manslaughter in the commission of an unlawful act must have been malum in se and not merely malum prohibitum. Id. For example, "the driving of an automobile in slight excess of the speed limit . . . is not the kind of unlawful act contemplated," but "voluntarily engaging in an affray" or using "an immoderate amount of force in suppressing a mutiny" were unlawful acts considered malum in se. Id.

The 1921 MCM defined involuntary manslaughter based upon the statutory definition in the Federal Penal Code -- an "unlawful killing . . . [i]n the commission of an unlawful act not amounting to a felony . . . ," but the ensuing discussion was identical to the 1917 version.[5] MCM ¶ 443, at 414 (1921 ed.); Federal Penal Code of 1910, § 274, Pub. L. No. 63-350, 35 Stat. 1088, 1143 (Act of March 4, 1909).

The 1928 MCM did not refer specifically to federal statutes to define manslaughter, but defined involuntary manslaughter as

---

[5] Section 119 of Naval Courts and Boards, 1937, another predecessor to Article 119(b), also referenced the Federal Penal Code definition, and followed the Army MCMs' distinction between malum in se and malum prohibitum. Naval Courts and Boards, 1937 § 119 (Government Printing Office 1945).

a "homicide unintentionally caused in the commission of an unlawful act, not amounting to a felony, nor likely to endanger life, or by culpable negligence in performing a lawful act . . . ." MCM ¶ 149a, at 165 (1928 ed.). It also substituted the 1917 and 1921 MCMs' discussion of malum in se versus malum prohibitum acts with an equivalent statement -- "[i]n involuntary manslaughter in the commission of an unlawful act, the unlawful act must be evil in itself by reason of its inherent nature and not an act which is wrong only because it is forbidden by statute or orders." Id. at 166. The rest of the discussion of involuntary manslaughter followed the earlier MCMs. Id. The 1949 MCM deleted the words "not amounting to a felony," but otherwise remained the same. MCM ¶ 180a, at 234 (1949 ed.).

The 1951 MCM redefined involuntary manslaughter as: "an unlawful homicide committed without an intent to kill or inflict great bodily harm; it is an unlawful killing by culpable negligence, or while perpetrating or attempting to perpetrate an offense other than burglary, sodomy, rape, robbery, or aggravated arson, directly affecting the person." MCM ¶ 198b, at 354 (1951 ed.) (emphasis added). An offense directly affecting the person was defined as "one affecting some particular person as distinguished from an offense affecting society in general." Id. at 355. It provided some examples of

10

offenses directly affecting the person:  "the various types of assault, battery, false imprisonment, voluntary engagement in an affray, the use of more force than is reasonably necessary in the suppression of a mutiny or riot, and maiming."  Id.  The 2008 MCM, under which Appellant was charged, is substantially similar to the 1951 version.  MCM pt. IV, ¶ 44.c.(2)(b) (2008 ed.).

It is unclear why Congress redefined involuntary manslaughter in the 1951 MCM, and to what extent it intended to preserve the distinction between unlawful acts that are inherently evil and unlawful acts that are wrong only because of a statute or order (i.e., malum in se versus malum prohibitum). The Judge Advocate General of the Army at the time, Major General Thomas H. Green, thought that requiring in the article "that the act be one 'directly affecting the person' is misleading and perhaps too restrictive."  Legislative History, supra, at 276; 96 Cong. Rec. 1307 (1950), reprinted in 2 Index and Legislative History to the Uniform Code of Military Justice, 1950 1962 (1985).  In an attempt to avoid this confusion, Senator Tobey unsuccessfully proposed that the language be amended, in keeping with the previous MCMs, to read:  "Any person subject to this code who unintentionally kills a human being in the commission of a culpably negligent act or in the commission of an act wrongful in itself but not inherently

11

dangerous to life is guilty of involuntary manslaughter . . . ."

Id.

Aside from this failed amendment, the Legal and Legislative Basis for the 1951 MCM provides the only background for the change in definition:

> As far as the offense of involuntary manslaughter is concerned, the terminology used in Article 119 to define the offense differs considerably from the common law terminology, but in substance the difference in definition is not very great. Under the common law, as under Article 119(b)(1), the first of the two types of involuntary manslaughter arises from culpable negligence. The second type of involuntary manslaughter at common law arises from the commission of a criminal act malum in se but not amounting to a felony of a kind which would naturally tend to cause death or great bodily harm to another person. . . . the phrase "directly affecting the person" is the result of an endeavor to define the distinction between malum in se and malum prohibitum. The phrase "affecting the person" may be found in Section 1050 of the New York Penal Law which contains a comparable provision with respect to involuntary manslaughter.[6]

---

[6] Former § 1050 of the New York Penal Law defined manslaughter in the first degree as a homicide by a "person engaged in committing, or attempting to commit, a misdemeanor, affecting the person or property, either of the person killed, or another." People v. Grieco, 193 N.E. 634, 635 (N.Y. 1934). The New York Court of Appeals interpreted this to mean that the misdemeanor had to affect "some particular person or property" rather than "a misdemeanor affecting society in general." Id. at 636 (overturning a defendant's conviction for manslaughter where he accidentally hit and killed a woman while driving drunk). Consistent with Grieco, the 1951 MCM explained that an "offense directly affecting the person is meant one affecting some particular person as distinguished from an offense affecting society in general." MCM ¶ 199a, at 355 (1951 ed.). The 2008 version maintains this language. MCM pt. IV, ¶ 44.c(2)(b) (2008 ed.).

United States v. Bennitt, No. 12-0616/AR

Charles L. Decker et al., Dep't of Defense, Legal and Legislative Basis, Manual for Courts-Martial, United States 270 (1951) (emphasis added).

Based upon this language, we conclude that Congress intended to retain, at least to some degree, the distinction between inherently evil acts (malum in se) and acts evil because they are forbidden by statute or order (malum prohibitum), and to limit "offense[s] . . . directly affecting the person" to those in which physical force is applied directly against an individual's body.  Under the various MCMs in force prior to the UCMJ, involuntary manslaughter could only be committed via a malum in se offense.  The last military precedent addressing this distinction held that drug offenses were malum prohibitum. United States v. Cavett, 18 C.M.R. 793, 795 (A.F.B.R. 1955), rev'd on other grounds, 6 C.M.A. 235, 19 C.M.R. 361 (1955).[7] Furthermore, in line with the language of the UCMJ, drug distribution is generally not within the intended scope of Article 119(b)(2), UCMJ, as it is more akin to an offense affecting society in general, rather than an offense like battery, maiming, or assault that affects a particular person. MCM pt. IV, ¶ 44.d.2(b) (2008 ed.).

_____

[7] It appears there was a general shift in the 1970s to view anti-narcotic laws as malum in se.  But, at least one state court has recently found they are malum prohibitum.  United States v. Anderson, 654 N.W.2d 367, 370-71 (Minn. Ct. App. 2002), rev'd on other grounds, 666 N.W.2d 696 (Minn. 2003).

13

Therefore, it appears that Congress did not intend for drug distribution to constitute an offense directly affecting the person such that it could support an involuntary manslaughter conviction. However, this Court's predecessor suggested in Sargent that under some circumstances drug distribution may constitute an "offense . . . directly affecting the person." 18 M.J. at 339. Therefore, we will address the application of Sargent to this case.

B.

Sargent specifically addressed "whether a sale of a prohibited substance constitutes an offense 'directly affecting the person' of the purchaser within the meaning of Article 119(b)(2), UCMJ.'" 18 M.J. at 332. The accused in Sargent was found guilty of involuntary manslaughter after he sold heroin to a private who died after snorting it. Id. This Court overturned the accused's conviction for manslaughter because his conduct was not an offense directly affecting the person. Id. at 335–39; see also United States v. Dillon, 18 M.J. 340, 342–43 (C.M.A. 1984) (holding that the accused could not be guilty of manslaughter because distributing cocaine was not an offense directly affecting the person).

We interpreted an "offense . . . directly affecting the person" to be "situations in which physical force is applied immediately against an individual's body." Sargent, 18 M.J. at

14

338–39 ("[W]e conclude that a conviction for involuntary manslaughter cannot be sustained solely by evidence that an accused sold someone a drug and that the purchaser later died from an overdose of that drug."). However, in a dictum we left the door open as to whether steps beyond distribution could constitute an offense directly affecting the person.

> On the other hand, when the seller has gone further and assisted the purchaser in injecting or ingesting the drug, the sale becomes one which does directly affect the person for purposes of Article 119(b)(2). Furthermore, because assisting someone to inject or ingest a drug constitutes aiding and abetting use of the drug and because such use is "an offense directly affecting the person," this prerequisite for Article 119(b)(2)'s application is present under those circumstances.

Id. at 339 (emphasis added). Like the Sargent court, we assume without deciding that under the right circumstances the distribution of drugs could constitute an offense directly affecting the person such that a conviction under Article 119(b)(2), UCMJ, could be legally sufficient.[8] However, in light of the intended scope of Article 119(b)(2), UCMJ, discussed above, we hold that Appellant's conduct does not constitute physical assistance such that it is an offense directly

---

[8] While the circumstances present in this case might have supported a conviction for involuntary manslaughter via culpable negligence under Article 119(b)(1), UCMJ, the Appellant was acquitted of such a charge. See United States v. Henderson, 23 M.J. 77, 80 (C.M.A. 1986) (finding a conviction for involuntary manslaughter under Article 119(b)(1), UCMJ, legally sufficient where the accused had distributed a large amount of cocaine to someone known to abuse cocaine to the point of harm).

affecting the person.  We therefore find Appellant's conviction for involuntary manslaughter to be legally insufficient.

V.

The judgment of the United States Army Court of Criminal Appeals is reversed as to Specification 2 of Charge I and the sentence, but is affirmed in all other respects.  The finding of guilty as to Specification 2 of Charge I is set aside and Specification 2 of Charge I is dismissed.  The record of trial is returned to the Judge Advocate General of the Army for submission to that court for reassessment of the sentence, or that court may order a rehearing on the sentence.

United States v. Bennitt, No. 12-0616/AR

BAKER, Chief Judge (dissenting):

I respectfully dissent for two reasons.

First, I would hold that Appellant's actions assisted the ingestion of a controlled substance and amounted to more than distribution. He crushed the pill in the presence of the users. He divided it into two lines. The users then snorted the crushed pill using a dollar bill. This constitutes aiding and abetting wrongful use. Moreover, aiding and abetting wrongful use in this fashion is "an offense . . . directly affecting the person." Helping someone ingest a drug meets a plain English definition of what it means to directly affect the person. The active participation in the ingestion is direct conduct, not the indirect conduct of distribution. And, it affects the person; that is what drugs do and that is apparently the purpose of taking the drug. As a result, Appellant's conviction was legally sufficient under Article 119(b)(2), UCMJ, 10 U.S.C. § 919(b)(2) (2006).

Second, in regards to the specified issue, the offense in question is not LK's wrongful use -- the offense is Appellant's aiding and abetting wrongful use. While LK was not subject to prosecution for wrongful use, this does not relieve Appellant of liability as a principal under Article 77(1), UCMJ, 10 U.S.C. § 877 (2006), which addresses "offense[s] punishable by this chapter." Wrongful use is such an offense. Therefore, I would

hold that Appellant may still properly be considered as aiding and abetting wrongful use.

DISCUSSION

Issue I

This case centers on whether Appellant's "aiding or abetting [the] wrongful use of Oxymorphone" constitutes an "offense . . . directly affecting the person" under Article 119(b)(2), UCMJ. An "offense directly affecting the person" is defined as an offense "affecting some particular person as distinguished from an offense affecting society in general." Manual for Courts-Martial, United States pt. IV, para. 44.c.(2)(b) (2008 ed.) (MCM). "Among offenses directly affecting the person are the various types of assault, battery, false imprisonment, voluntary engagement in an affray, and maiming." Id.

In United States v. Sargent, this Court's predecessor addressed this issue. 18 M.J. 331 (C.M.A. 1984). First, the Court considered the legislative history of Article 119, UCMJ, in detail. Id. at 335-38. The Court noted the discussion of paragraph 198, in Charles L. Decker et al., Dep't of Defense, Legal and Legislative Basis, Manual for Courts-Martial, United States (1951), which states that the phrase "'directly affecting the person' is the result of an endeavor to define the distinction between malum in se and malum prohibitum." 18 M.J.

2

at 337.  However, unlike the majority, the Sargent Court concluded that the reason why Congress redefined involuntary manslaughter to apply to an "offense directly affecting the person" was "not clear from the legislative history."  Id. at 336.

There is no need to resort to Latin when plain English will do.  Without clear guidance from the legislative history, the Sargent Court turned to the plain language of Article 119, UCMJ, the MCM's interpretations, and civilian jurisprudence.  Id. at 337-38.  Paragraph 198(b) of the 1951 MCM defined an offense directly affecting the person as "one affecting some particular person as distinguished from an offense affecting society in general."  MCM para. 198b, at 355; see also People v. Grieco, 193 N.E. 634, 635-36 (1934) (requiring a misdemeanor affecting some particular person or property as distinguished from a misdemeanor affecting society in general).  The Sargent Court concluded:

> Although the illustrations [of possible qualifying offenses] in the Manual do not purport to be exclusive, they all involve situations in which physical force is applied immediately against an individual's body.  Thus, they suggest that the statutory phrase "affecting the person" uses the word "person" not only to refer to an individual -- as distinguished from society in general -- but also to mean the physical "person" of the individual.  The presence of the word "directly" in Article 119(b)(2) supports such an interpretation and indicates that Congress intended involuntary manslaughter to be a crime narrower in scope than it had been in military law before enactment of the Code.

3

18 M.J. at 338.

Applying this standard, the Sargent Court determined that distribution is not an offense directly affecting the person, even if the purchaser later died from an overdose of the drug. Id. at 339.  I agree.  However, the Court went on to state that:

> [W]hen the seller has gone further and assisted the purchaser in injecting or ingesting the drug, the sale becomes one which does directly affect the person for purposes of Article 119(b)(2).  Furthermore, because assisting someone to inject or ingest a drug constitutes aiding and abetting use of the drug and because such use is "an offense directly affecting the person," this prerequisite for Article 119(b)(2)'s application is present under those circumstances.

Id.

I would adopt the position of the Sargent Court, and hold that assisting the ingestion or injection of a controlled substance, and thereby aiding and abetting wrongful use, would sustain an involuntary manslaughter conviction under Article 119(b)(2), UCMJ.  Assisting someone to take a drug directly affects that person.  While the use of drugs has a deleterious effect on military discipline and readiness in general,[1] wrongful use of a controlled substance also has a direct physical effect on the body of the user, a particular person.  Civilian

---

[1] See, e.g., Hearings on S. 2521 Before the Subcomm. on Manpower and Personnel of the Comm. on Armed Servs., 97th Cong. 14 (1983) (opening statement of Sen. Roger W. Jepsen, Chairman) (describing "drug abuse in the military" as "a most serious threat to our military readiness"), available at http://www.loc.gov/rr/frd/Military_Law/pdf/act_1982.pdf.

4

precedent also supports the view that language like that of

Article 119(b)(2), UCMJ, would authorize a manslaughter

conviction of someone who assists the ingestion or injection of

a controlled substance.  See, e.g., State v. Forsman, 260 N.W.2d

160, 164 (Minn. 1977) ("The distribution of heroin by direct

injection into the body of another is a felony 'upon or

affecting the person whose death was caused' thereby." (footnote

omitted)).[2]

The record supports Appellant's conviction for aiding and

abetting use by assisting in the ingestion of the drug.  In his

statement, Appellant admitted the following facts:

> When she saw me snorting the two pills Leah asked me if
> her and her friend could have the other one.  I told her
> "yes."  That is when I smashed it on the nightstand for
> them to snort it.  I then divided it with a card that I
> had in my wallet.  They then came to the nightstand and
> snorted the pill I had crushed for them.

Although Appellant claims that he was "dividing a whole into two

parts to effectuate two distributions," his actions went beyond

the mere transfer of possession.  While there was no injection

to perform, Appellant actively took the additional steps

necessary to aid in ingesting the controlled substance.  Compare

United States v. Dillon, 18 M.J. 340, 342-43 (C.M.A. 1984) (the

---

[2] Assisting someone take a drug is more than distribution and it
either affects the person taking the drug or it does not.
Drawing distinctions between handing someone a needle and
sticking a needle in someone's arm is, in a phrase, too fine a
point to draw meaningful and understandable distinctions in
criminal law.

facts did not sustain involuntary manslaughter conviction when "the evidence was uncontradicted that the decedent alone divided the powder on a mirror with a razor blade; mixed the powder in a spoon; and injected it twice into his own arms without any assistance from appellant"); United States v. Henderson, 23 M.J. 77, 80-81 (C.M.A. 1986) (appellant became culpably negligent for an unlawful death "by making available a large quantity of cocaine knowing it would be injected, by permitting the privacy of his room to be utilized for the injection, by encouraging the decedent to 'get fired up,' and by his presence during the consumption of the cocaine"). Appellant crushed the pills, thereby removing the timed-release coating, and divided the resulting powder into two lines for snorting. The drugs immediately had a direct physical effect on LK, ultimately causing her death. These actions go beyond mere distribution, and include almost everything possible to aid ingestion by snorting the drug.

Issue 2

I would hold that Appellant's conviction is legally sufficient, regardless of whether LK was subject to the UCMJ or was violating applicable federal or state laws. The offense in question is not LK's wrongful use -- the offense is Appellant's aiding and abetting wrongful use. See MCM pt. IV, para. 44.b.(2)(d) ("while the accused was perpetrating or attempting

6

to perpetrate an offense directly affecting the person" (emphasis added)).  Appellant is not relieved from his responsibility for aiding and abetting wrongful use by LK's legal status.

Article 77(1), UCMJ, applies to "Any person punishable under this chapter who . . . commits an offense punishable by this chapter, or aids, abets, counsels, commands or procures its commission."  Emphasis added.  Under Article 77(1), UCMJ, Appellant is a principal.  Principals are independently liable, so that "[o]ne may be a principal, even if the perpetrator is not identified or prosecuted, or is acquitted."  MCM pt. IV, para. 1.b.(6); see also Standefer v. United States, 447 U.S. 10, 20 (1980) ("[A]ll participants in conduct violating a federal criminal statute are 'principals.'  As such, they are punishable for their criminal conduct; the fate of other participants is irrelevant.").

This Court has affirmed convictions of servicemembers who aided and abetted civilians who were not subject to the UCMJ. In United States v. Hill, for example, the Court affirmed the conviction of an accused who aided and abetted the wrongful distribution of narcotics, despite the fact that the individual he was aiding and abetting was a civilian not subject to the UCMJ.  25 M.J. 411, 412-15 (C.M.A. 1988); see also United States v. Jones, 37 M.J. 459, 461 (C.M.A. 1993) (affirming a conviction

7

for attempting to distribute a controlled substance under the theory that the accused had aided and abetted a civilian in the distribution).

While this Court has not addressed a situation where the perpetrator was a civilian who committed a crime that was not also unlawful under state or federal law, the lower courts have by implication. In United States v. Minor, the United States Army Court of Military Review affirmed a conviction for sodomy by aiding and abetting a civilian, without considering whether sodomy was an offense in the local jurisdiction. 11 M.J. 608, 611 (A.C.M.R. 1981) ("The amenability of the actual perpetrator to prosecution is not a requirement for criminal liability as an aider and abettor. The determinant is whether the act aided and abetted is an offense, not whether the perpetrator is subject to prosecution."). In United States v. Blevins, the United States Air Force Board of Review addressed the possible consequences of precluding trial when the principal offender was not amenable to prosecution, noting:

> It would place a most difficult burden on military law
> to construe Article 78, Uniform Code of Military
> Justice, as being inapplicable in situations where the
> principal offender was not subject to trial and
> punishment under the Code. In many instances, the only
> practical solution would be to turn the military
> accessory over to the Federal or state court, as
> applicable, since an alternative prosecution under the
> general article would be very difficult and risk the
> hazard of preemption. Further, if the offense occurred
> in a foreign country, the accused would either go

8

> unpunished, or have to be turned over to a foreign
> court, always a sensitive and undesirable situation.

34 C.M.R. 967, 979 (A.F.B.R. 1964) (citations omitted).  The

Court concluded that:

> a military accused may be convicted under Article 78,
> Uniform Code of Military Justice, without regard to
> the amenability of the principal offender to military
> jurisdiction [which] is consistent with the wording of
> the Article itself, with the manifest intent of the
> framers of the Code that military personnel can be
> tried by court-martial for violation of its punitive
> articles, and with the continuing relaxing of the
> rigors of the common law.  Id.

Thus, the requirement is that an "offense punishable by

this chapter" be committed, not that the perpetrator be amenable

to prosecution.  Article 77 (1), UCMJ; Article 119(b)(2), UCMJ.

Article 112a, UCMJ, 10 U.S.C. § 912a (2006), provides that

"[a]ny person subject to this chapter who wrongfully uses . . .

a substance described in subsection (b) shall be punished as a

court-martial may direct."  Therefore, the elements for wrongful

use of a controlled substance are:

   (a)  That the accused used a controlled substance; and

   (b)  That the use by the accused was wrongful.

MCM pt. IV, para. 37.b.(2).  Appellant's aided and abetted the

use of a controlled substance, and his actions were wrongful

under Article 112a, UCMJ.  That LK is not subject to prosecution

does not relieve Appellant of liability as a principal under

Article 77(1), UCMJ.[3]

    For the reasons stated above, I respectfully dissent.

---

[3] Of course, the Government has masked the clarity of the law in the manner in which the specification was drafted. The specification references the aiding and abetting of "her wrongful use" as opposed to "the wrongful use, an offense punishable by this chapter." Nonetheless, I am satisfied that the specification and the underlying law put Appellant on notice as to what he had to defend against. The arguments at trial indicate so as well.